**N.A. LAMBRECHT and Miriam Loveman, Plaintiffs Below, Appellants,**

v.

**Stanley O'NEAL, et al., Defendants Below, Appellees.**

**No. 135, 2010.**

Supreme Court of Delaware.

Submitted: July 7, 2010.
Decided: Aug. 27, 2010.

278

Adam L. Balick, and Melony R. Anderson, Esquires, of Balick & Balick, LLC, Wilmington, Delaware; Bartholemew J. Dalton, Esquire, of Dalton & Associates, P.A., Wilmington, Delaware; for Appellants; OF COUNSEL: David A.P. Brower (argued) and Caitlin M. Moyna, Esquires, of Brower Piven, PC, New York, New York; for Appellant Loveman; OF COUNSEL: Jonathan W. Cuneo and Matthew E. Miller, Esquires, of Cuneo, Gilbert & Laduca, LLP, Washington, D.C.; Richard D. Greenfield, Esquire, of Greenfield & Goodman, LLC, New York, New York; for Appellant Lambrecht.

Paul J. Lockwood, Esquire (argued), of Skadden, Arps, Slate, Meagher & Flom LLP, Wilmington, Delaware; OF COUNSEL: Jay B. Kasner and Scott D. Musoff, Esquires, of Skadden, Arps, Slate, Meagher & Flom LLP, New York, New York; for Appellees Bank of America Corporation and Merrill Lynch & Co., Inc.

A. Gilchrist Sparks, III, Esquire, of Morris Nichols Arsht & Tunnell, Wilmington, Delaware; OF COUNSEL: Gregory A. Markel, Esquire, of Cadwalader Wickersham & Taft LLP, New York, New York; for Appellees Christ, Codina, Colbert, Cribiore, Finnegan, Jonas, Peters, Prueher, Reese and Rossotti.

Collins J. Seitz, Jr., Esquire, of Connolly Bove Lodge & Hutz LLP; for Appellees O'Neal, Fakahany, Edwards, Fleming, Lattanzio, Mallach, Semerci and Thain; OF COUNSEL: Michael J. Chepiga and Kimberly A. Hamm, Esquires, of Simpson Thacher & Bartlett LLP, New York, New York; for Appellee O'Neal; OF COUNSEL: James N. Benedict, Andrew W. Robertson and Michael B. Weiner, Esquires, of Milbank, Tweed, Hadley & McCloy LLP, New York, New York; for Appellee Fakahany; OF COUNSEL: Jonathan D. Polkes and Stephen A. Radin, Esquires, of Weil, Gotshal & Manges LLP, New York, New York; for Appellee Fleming; OF COUNSEL: Hollis Gonerka Bart, Brian Dunefsky and Chaya F. Weinberg–Brodt, Esquires of Withers Bergman LLP, New York, New York; for Appellee Semerci; OF COUNSEL: Daniel J. Fetterman and Adam K. Grant, Esquires, of Kasowitz, Benson, Torres & Friedman LLP, New York, New York; for Appellee Lattanzio; OF COUNSEL: Henry Putzel, and Lucia T. Chapman, Esquires, of the Law Firm of Henry Putzel, III, New York, New York; for Appellee Mallach; OF COUNSEL: Andrew J. Levander and David S. Hoffner, Esquires, of Dechert LLP, New York, New York; for Appellee Thain; OF COUNSEL: Richard D. Bernstein, Antonio Yanez, Jr. and Saméer Advani, Esquires, of Willkie Farr & Gallagher LLP, New York, New York; for Appellee Edwards.

James J. Freebery, Esquire, of McCarter & English LLP, Wilmington, Delaware; OF COUNSEL: William M. Moran, Esquire, of McCarter & English LLP, New York, New York; for Appellee Kim.

Daniel A. Dreisbach, Esquire, of Richards Layton & Finger. P.A., Wilmington, Delaware; for Appellees Lewis and Curl; OF COUNSEL: Colby A. Smith, Esquire, of Debevoise & Plimpton LLP, Washington D.C.; Mary Jo White and Andrew J. Ceresney, Esquires, of Debevoise & Plimpton, LLP, New York, New York; for Appellee Lewis; OF COUNSEL: Elkan Abramowitz, Richard D. Weinberg and Eli J. Mark, Esquires, of Morvillo, Abramowitz, Grand, Iason, Anello & Bohrer, P.C., New York, New York; for Appellee Curl.

Before STEELE, Chief Justice, HOLLAND, BERGER, JACOBS and RIDGELY, Justices, constituting the Court en Banc.

JACOBS, Justice:

This is a proceeding, under Article IV, Section 11(8) of the Delaware Constitution and Supreme Court Rule 41, on a question of law certified to, and accepted by us, from the United States District Court for the Southern District of New York ("Southern District"). The certified question arises out of two factually related actions pending before The Honorable Jed S. Rakoff of the Southern District.[1] In those actions (the "double derivative actions"), claims are asserted double derivatively on behalf of Bank of America Corporation ("BofA") and its wholly owned subsidiary, Merrill Lynch & Co., Inc. ("Merrill Lynch"). Originally, the plaintiffs in those actions filed standard derivative actions on behalf of Merrill Lynch, a Delaware corporation, to recover losses Merrill Lynch suffered in transactions that occurred before BofA acquired Merrill Lynch in a stock-for-stock merger. After the merger, the complaints were amended to take the form of double derivative actions in which the plaintiffs seek that same relief. The issue posed by the certified question implicates Delaware's legal requirements for standing to sue double derivatively in these circumstances.

## I. PROCEDURAL BACKGROUND

In the merger, Merrill Lynch became a wholly-owned subsidiary of BofA and the plaintiffs' Merrill Lynch shares were converted to shares of BofA.[2] Shortly thereafter, the defendants moved to dismiss the then-pending Southern District derivative actions on the ground that the plaintiffs, who were no longer shareholders of Merrill Lynch by reason of the merger, had lost their standing to assert derivative claims on Merrill Lynch's behalf. The dismissal motions were grounded on the settled Delaware law precept that, to have standing to bring a derivative action, the plaintiff must be a shareholder of the corporation at the time of the acts complained of and must also remain a shareholder of that company throughout the litigation.[3] The Southern District dismissed both actions,[4] but "without prejudice to plaintiffs[ ] repleading their actions as so-called 'double derivative' actions, whereby they would seek to force the board of BofA, as 100% owner of the stock in BofA's Merrill [Lynch] subsidiary, [in turn] to force the Merrill board to bring the action that the plaintiffs had originally sought to have Merrill bring."[5] Thereafter, one of the Southern District plaintiffs repled her claim to be double derivative, and the other filed a new lawsuit that took the form of a double derivative action.

In response, the defendants again moved to dismiss for lack of standing, this time advancing a new argument. Specifically, the defendants asserted that to have standing to sue double derivatively, the

1. The two cases are *Lambrecht v. O'Neal,* 09 Civ. 8259 (S.D.N.Y.) (the *"Lambrecht* action") and a derivative action filed by plaintiff Miriam Loveman styled as *Derivative Action,* 07 Civ. 9696 (S.D.N.Y.) (the *"Loveman* action."). The *Lambrecht* and *Loveman* actions are consolidated into a far more comprehensive litigation in the Southern District, captioned as *In re Merrill Lynch & Co., Inc. Sec., Derivative & ERISA Litig.,* Master File No. 07 Civ. 9633 (JSR).

2. The merger closed on or about January 1, 2009.

3. 8 *Del. C.* § 327; *Lewis v. Anderson,* 477 A.2d 1040, 1046 (Del.1984).

4. *See In re Merrill Lynch & Co., Inc., Sec., Derivative and ERISA Litig.,* 597 F.Supp.2d 427 (S.D.N.Y.2009).

5. *In re Merrill Lynch & Co., Inc., Sec., Derivative & ERISA Litig.,* 692 F.Supp.2d 370, 372 (S.D.N.Y.2010).

plaintiffs must be able to show: (a) that they were (and remain) shareholders of BofA both after the merger and also at the time of the pre-merger Merrill Lynch wrongdoing complained of, and (b) that BofA itself was a shareholder of Merrill Lynch at the time of that pre-merger conduct.

That new argument prompted the Southern District, following briefing and oral argument, to enter an order on March 9, 2010, certifying to this Court the following question:

> Whether plaintiffs in a double derivative action under Delaware law, who were pre-merger shareholders in the acquired company and who are current shareholders, by virtue of a stock-for-stock merger, in the post-merger parent company, must also demonstrate that, at the time of the alleged wrongdoing at the acquired company, (a) they owned stock in the acquiring company, and (b) the acquiring company owned stock in the acquired company.[6]

This Court accepted the certified question of law on April 1, 2010,[7] and after briefing, the matter was argued on July 7, 2010. This is the decision of the Court answering the certified question.

## II. RELEVANT FACTS

Given the purely legal nature of the question presented, the relevant facts may be succinctly stated, as follows:

The Southern District derivative actions against certain Merrill Lynch officers and directors rest primarily on alleged fiduciary misconduct that predated the merger. The plaintiffs claim that Merrill Lynch's senior management and directors breached their fiduciary duties by involving Merrill Lynch in underwriting collateralized debt obligations and by disregarding warnings about risks concerning its mortgage-related activities, thereby causing Merrill Lynch to lose billions of dollars. In addition, plaintiffs claim that on the eve of the merger, Merrill Lynch, with the assent of BofA, improperly paid bonuses totaling $3.6 billion to various Merrill Lynch employees.

Plaintiff Lambrecht was not a BofA shareholder at the time of the transactions

---

**6.** Certification Order entered by The Honorable Jed S. Rakoff in Master File No. 07 Civ. 9633 (S.D.N.Y.) on March 9, 2010. In its accompanying Memorandum Order, the court candidly expressed its view that the defendants' arguments "make no sense," elaborating as follows:

> What possible policy would be served by requiring that at the time of the underlying Merrill transactions complained of, the plaintiffs be shareholders in Bank of America, which at that time was a total stranger to the transactions? Likewise, what possible policy would be served by requiring that Bank of America, which did not acquire the ability to force Merrill to pursue its "chose in action" against its former officers and directors until the time of the merger, be a shareholder in Merrill at the time of the underlying transactions complained of? Yet there is at least one decision of the Delaware Chancery Court that seems to hold that just such requirements are part of

Delaware law, namely *Saito v. McCall,* No. Civ. A. 17132–NC, 2004 WL 3029876 (Del. Ch. Dec. 20, 2004), where the Chancellor, with little discussion or explanation, held that "plaintiffs . . . were not [the parent company's] shareholders before [the date of the merger], so they cannot bring a derivative suit, double or otherwise," *id.,* at *9, and that the "claim must also fail because plaintiffs have failed to allege that [the parent company] was a shareholder of [the subsidiary] at the time the alleged harm occurred." *id.* at *9 n. 8. This Court is thus left with unsatisfactory guidance as to what Delaware law requires. . . . Such requirements would render double derivative lawsuits virtually impossible to bring except in bizarrely happenstance circumstances.

*In re Merrill Lynch & Co., Inc., Sec., Derivative & ERISA Litig.,* 692 F.Supp.2d at 372–73.

**7.** That Order was revised on April 6, 2010.

complained of. She became a BofA share-holder only when her Merrill Lynch shares were converted to BofA shares in the merger. Plaintiff Loveman's Merrill Lynch shares were similarly converted, although it appears that Loveman also owned BofA shares before the merger. The record does not disclose, however, whether her ownership of BofA shares was contemporaneous with the alleged wrongdoing at Merrill Lynch. Therefore, it is assumed, for purposes of this Opinion, that Loveman's ownership was not contemporaneous.

For purposes of this proceeding, the parties have assumed (as does this Court) that BofA was not a Merrill Lynch share-holder at the time of the conduct complained of in the double derivative actions.

### III. THE CERTIFIED QUESTION

■ To reiterate, the question before us is:

Whether plaintiffs in a double derivative action under Delaware law, who were pre-merger shareholders in the acquired company and who are current share-holders, by virtue of a stock-for-stock merger, in the post-merger parent company, must also demonstrate that, at the time of the alleged wrongdoing at the acquired company, (a) they owned stock in the acquiring company, and (b) the acquiring company owned stock in the acquired company.

That question is one of law which this Court decides *de novo*.[8]

### IV. ANALYSIS

#### A. Preliminary: The Legal Landscape

Before beginning our substantive analysis of the legal question presented, it is necessary first to portray the broader doctrinal context within which the question arises. That, in turn, requires us to treat two legally distinct subjects which, in this particular case, happen to converge factually and generate the issue presented. Those two topics are: (1) the nature of a double derivative action and (2) the standing of a plaintiff shareholder to maintain a derivative action on behalf of a corporation that is later acquired in a merger that eliminates the plaintiff's shareholdings in the acquired corporation. Our preliminary discussion of the legal background, although lengthier than we would prefer, will shorten and simplify the substantive legal analysis.

#### (1) *Nature of a Double Derivative Action*

Any discussion of a double derivative action must be with reference to the baseline "standard" derivative action. To illustrate, in a standard derivative action, a shareholder brings a lawsuit asserting a claim belonging to a corporate entity in which the shareholder owns shares ("corporation A"). A double derivative action, in contrast, involves two entities: corporation A (the corporation whose claim is being asserted), and corporation B, which owns or controls corporation A. We have previously observed that:

The stockholder derivative suit is an important and unique feature of corporate governance. In such a suit, a stockholder asserts a cause of action belonging to the corporation.... In a double derivative suit, such as the present case, a stockholder of a parent corporation seeks recovery for a cause of action

---

**8.** *CA, Inc. v. AFSCME Employees Pension Plan*, 953 A.2d 227, 231 (Del.2008). *See also Rales v. Blasband*, 634 A.2d 927, 931 (Del. 1993) ("Because we are addressing a certified question of law, as distinct from a review of a lower court decision, the normal standards of review do not apply.").

belonging to a subsidiary corporation.... Because directors are empowered to manage, or direct the management of, the business and affairs of the corporation, 8 *Del. C.* § 141(a), the right of a stockholder to prosecute a derivative suit is limited to situations where the stockholder has demanded that the directors pursue the corporate claim and they have wrongfully refused to do so or where demand is excused because the directors are incapable of making an impartial decision regarding such litigation.[9]

Thus, by its nature a double derivative suit is one brought by a shareholder of a parent corporation to enforce a claim belonging to a subsidiary that is either wholly owned or majority controlled. Normally, such a claim is one that only the parent corporation, acting through its board of directors, is empowered to enforce. Cases may arise, however, where the parent corporation's board is shown to be incapable of making an impartial business judgment regarding whether to assert the subsidiary's claim. In those cases a shareholder of the parent will be permitted to enforce that claim on the parent corporation's behalf, that is, double derivatively.[10]

Double derivative actions generally fall into two distinct categories. The first are lawsuits that are brought originally as double-derivative actions on behalf of a parent corporation that has a pre-existing, wholly owned subsidiary at the time of the alleged wrongful conduct at the subsidiary level.

In this category, no intervening merger takes place. The second category involves cases, such as this, where the action is brought originally as a standard derivative action on behalf of a corporation that thereafter is acquired by another corporation in an intervening stock-for-stock merger. We distinguish these two categories because they create different standing (and pre-suit demand) issues.

In the first category—cases where the wholly-owned subsidiary pre-existed the alleged wrongdoing and where no intervening merger took place—corporation A is already a subsidiary of corporation B at the time of the alleged wrongdoing at corporation A. In those cases, only the parent corporation owns the subsidiary's stock at the time of the alleged wrongdoing, and the plaintiff owns stock only in the parent. Therefore, a Rule 23.1 demand could only be made—and a derivative action could only be brought—at the parent, not the subsidiary, level.[11]

*Sternberg v. O'Neil*[12] exemplifies this type of case. In *Sternberg*, the subsidiary (a Delaware corporation) was acquired by the parent (an Ohio corporation) thirty years before the alleged wrongdoing occurred. The plaintiff, who owned stock in the parent corporation, brought a double derivative action as a shareholder of the parent, claiming (among other things) mismanagement and breaches of fiduciary duty by the directors of the subsidiary that resulted in harm to the subsidiary and, consequently, to the parent as the subsid-

**9.** *Rales v. Blasband,* 634 A.2d at 932 (internal citations omitted).

**10.** *Id.* at 934.

**11.** Ct. of Ch. R. 23.1(a) ("In a derivative action brought by one or more shareholders ... to enforce a right of a corporation ... the complaint shall allege that the plaintiff was a shareholder ... at the time of the transaction of which the plaintiff complains.... The complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors ... and the reasons for the plaintiff's failure to obtain the action or for not making the effort.")

**12.** 550 A.2d 1105 (Del.1988).

iary's only shareholder.[13] In these circumstances, our law recognizes a right to proceed double derivatively. Otherwise, there would be no procedural vehicle to remedy the claimed wrongdoing in cases where the parent company board's decision not to enforce the subsidiary's claim is unprotected by the business judgment rule.[14] Because the first category does not include the case before us, we set that category aside and do not discuss it again in this Opinion.

The second category involves actions brought derivatively on behalf of a corporation that was originally a stand-alone entity but where, as a result of being acquired in a later stock-for-stock merger, (1) the acquired corporation became a wholly-owned subsidiary of the acquiring corporation and (2) the shareholders of the (pre-merger) entity became shareholders of the acquiring corporation. *Lewis v. Ward*[15] and this case are two examples. What materially differentiates the second category from the first is that in this second category, as a matter of law the merger operates to divest the original shareholder plaintiff of standing to maintain the standard derivative action brought originally on behalf of the acquired corporation. That result, in turn, creates issues relating to whether—and, if so, in what circumstances—the original stockholder plaintiff, as a newly incarnated shareholder of the acquirer-parent corporation can have standing to assert the (now wholly-owned) subsidiary's claim double-derivatively. That brings us to the second subject of this preliminary sketch of the current legal roadmap: standing.

13. *Sternberg* did not address the merits of the double derivative claims, but only whether the constitutional and statutory requirements for *in personam* jurisdiction over the Ohio corporate parent and certain non-resident directors had been satisfied. This Court found that they were. We held (*inter alia* ) that the parent company's continued 30 year ownership of a Delaware corporate subsidiary satisfied due process requirements, including "traditional notions of fair play and substantial justice," and that Delaware's interest in providing a "forum for shareholder derivative litigation involving the internal affairs of its domestic corporations," were sufficient minimum contacts to sustain specific jurisdiction over the Ohio parent corporation and its non-resident directors. *Id.* at 1124–26. *Sternberg* is one of several Delaware decisions that legitimize and validate the double derivative action as a remedy available to stockholders. *See, e.g., Sutherland v. Sutherland*, 2010 WL 1838968 (Del.Ch. May 3, 2010).

14. Within this first category there is a subset of cases where the parent owns a controlling interest—but not 100%—of the subsidiary. In those cases a minority shareholder of the subsidiary who owned shares at the time of the alleged wrongdoing could bring a standard derivative action on the subsidiary's behalf. In that scenario, a question that logically arises is whether, in addition to that standard remedy, a shareholder of the parent company could assert a double derivative claim seeking the same relief on the parent corporation's behalf. Courts in a handful of jurisdictions appear to recognize, at least implicitly, a right of parent company shareholders at the time of the alleged wrongdoing to sue double derivatively. *See, e.g., Issner v. Aldrich*, 254 F.Supp. 696 (D.Del.1966) (implicitly recognizing the right of a shareholder of a Virginia corporation to bring a double derivative action claiming wrongdoing by directors and the remaining stockholder against the corporation's 50% owned subsidiary, but dismissing action for failure to show that demand was excused); *Carlin v. Brownfield*, 1985 WL 10327 (Oh.Ct. App. June 18, 1985) (explicitly recognizing right of corporate shareholder to bring double derivative action on behalf of corporation's 98%-owned subsidiary); *Kaufman v. Wolfson*, 1 A.D.2d 555, 151 N.Y.S.2d 530, 532 (1956) ("Suit by the stockholder of a parent corporation need not be limited only to situations in which the subsidiary is wholly owned or in which there is no one else who can sue."). To date, the Delaware courts have not addressed this specific question nor do we purport to do so, expressly or implicitly, in this Opinion.

15. 852 A.2d 896 (Del.2004).

### (2) Standing To Sue Double Derivatively

The standing issue is a consequence of the doctrine articulated in *Lewis v. Anderson*.[16] There, a standard derivative action was brought in the Court of Chancery on behalf of Conoco Inc. (Old Conoco) charging its directors with breaches of fiduciary duty. Thereafter, and while that action was pending, E.I. duPont de Nemours, Inc. (DuPont) acquired Old Conoco in a stock-for-stock merger. As a result, Old Conoco disappeared and the surviving corporation—a wholly owned subsidiary of DuPont—was renamed Conoco, Inc. (New Conoco). After the merger, the defendants moved to dismiss the derivative action, arguing that the plaintiff had lost his standing to maintain it because as a matter of law the derivative claim became the property of New Conoco, which post-merger was the only party with standing to assert the claim. The Court of Chancery dismissed the action, and this Court affirmed. The reasoning which supports that outcome is critical to understanding how the standing issue arises in the double derivative context.

The *Anderson* court, citing earlier Delaware decisions, held that for a shareholder to have standing to maintain a derivative action, the plaintiff "must not only be a stockholder at the time of the alleged wrong and at the time of commencement of suit but ... must also maintain shareholder status throughout the litigation."[17] These two imperatives are referred to, respectively, as the "contemporaneous ownership" and the "continuous ownership" requirements. The contemporaneous ownership requirement is imposed by statute;[18] while the continuous ownership requirement is a creature of common law. *Lewis v. Anderson* holds that where the corporation on whose behalf a derivative action is pending is later acquired in a merger that deprives the derivative plaintiff of his shares, the derivative claim— originally belonging to the acquired corporation—is transferred to and becomes an asset of the acquiring corporation as a matter of statutory law.[19] Because as a consequence the original derivative shareholder plaintiff can no longer satisfy the continuous ownership requirement, the plaintiff loses standing to maintain the derivative action. And, because the claim is now (post merger) the property of the acquiring corporation, that corporation is now the only party with standing to enforce the claim, either by substituting itself as the plaintiff or by authorizing the original plaintiff to continue prosecuting the suit on the acquiring company's behalf.[20]

That rationale generates the question presented here, which may be stated thusly: where a shareholder has lost standing to maintain a standard derivative action by

---

**16.** 477 A.2d 1040 (Del.1984).

**17.** *Id.* at 1046.

**18.** 8 *Del. C.* § 327 provides:

In any derivative suit instituted by a stockholder of a corporation, it shall be averred in the complaint that the plaintiff was a stockholder of the corporation at the time of the transaction of which such stockholder complains or that such stockholder's stock thereafter devolved upon such stockholder by operation of law.

**19.** *Lewis v. Anderson,* 477 A.2d at 1049–50; 8 *Del. C.* § 259.

**20.** *Lewis v. Anderson* recognizes only two exceptions to this loss-of-standing rule: (1) where the merger itself is the subject of a claim of fraud, being perpetrated merely to deprive shareholders of their standing to bring the derivative action, or (2) where the merger is essentially a reorganization that does not affect the plaintiff's relative ownership in the post-merger enterprise. Neither exception is invoked by the plaintiffs in this proceeding before us.

reason of an acquisition of the corporation in a stock-for-stock merger, may that shareholder, in his new capacity as a shareholder of the acquiring corporation, assert the claim double derivatively and, if so, what requirements must the plaintiff satisfy? That issue did not arise in *Lewis v. Anderson* because the plaintiff there did not sue double derivatively, but the issue did arise in *Rales v. Blasband,* which involved facts similar (although not identical) to those presented here.

*Rales* had a tortuous procedural history. The plaintiff brought a derivative action on behalf of a Delaware parent corporation that had previously acquired (and wholly owned) a subsidiary in a stock-for-stock merger. The action sought to remedy alleged pre-merger misconduct of the subsidiary's board. The defendants moved to dismiss the federal action for lack of standing and for failure to plead that a pre-suit demand would have been futile. Granting the motion, the District Court held that the plaintiff could not assert his action double derivatively because he failed to allege that the acquiring corporation was a stockholder of the acquired corporation at the time of the wrongdoing. The District Court also rejected the plaintiff's conten-

tion that he had standing to maintain his action on the (acquired) subsidiary's behalf, because that standing was lost as a result of the merger.[21] On appeal, the United States Court of Appeals for the Third Circuit vacated the District Court's order. Holding that the plaintiff had standing to bring his claim as a double derivative action, the Third Circuit permitted the plaintiff to amend his complaint to plead demand excusal.[22]

The plaintiff amended his complaint and the defendants again moved to dismiss on the basis that the plaintiffs had not adequately pled that demand on the parent corporation's board was excused. The question of whether demand was excused was then certified to and accepted by this Court, and became the subject of this Court's decision in *Rales v. Blasband,* which was limited to the demand excusal issue.[23]

In *Rales* we held that the traditional *Aronson v. Lewis*[24] demand excusal test would not be employed in considering whether a demand on the parent board was required in a double derivative action. Rather, a different test (the *"Rales* test") would apply, which is whether the particu-

**21.** *Blasband v. Rales,* 772 F.Supp. 850 (D.Del. 1991). Factually, *Blasband v. Rales* is an apparent "outlier," in that no pre-merger derivative action was ever filed at the subsidiary level. The action was filed post-merger at the parent corporation level, asserting the subsidiary's pre-merger claim. That likely explains why the District Court characterized the lawsuit as "a novel action which is neither a simple derivative suit or a double derivative suit." 634 A.2d at 930. The factual distinction between the form of the action in *Rales* and this case is not legally significant for our analysis, because the actions in *Rales* and in this case were, from a purely functional and remedial standpoint, double-derivative.

**22.** *Blasband v. Rales,* 971 F.2d 1034 (3rd Cir. 1992).

**23.** In *Rales,* this Court considered itself bound by the Third Circuit's ruling that the plaintiff had standing to sue double derivatively, as the law of the case. We cautioned, however, that "the limited scope of [this] proceeding should not be interpreted as either an acceptance or a rejection of the Third Circuit's conclusions on matters of the substantive Delaware corporation law relating to the standing issue decided in *Blasband I." Rales v. Blasband,* 634 A.2d at 931 n. 5. In *Lewis v. Ward,* 852 A.2d 896 (Del.2004) this Court held that the Third Circuit's decision in *Rales* was inconsistent with *Lewis v. Anderson* to the extent that decision addressed standing to maintain a *standard* derivative suit after a merger.

**24.** 473 A.2d 805 (Del.1984).

larized factual allegations of the complaint create a reasonable doubt that the parent's board of directors could properly have exercised its independent and disinterested business judgment in responding to a demand.[25] This Court further held that in a double derivative action the *Rales* test would apply as of the time the complaint was filed, as distinguished from the time of the alleged wrongdoing.[26]

The most recent signpost on this legal roadmap is *Lewis v. Ward*.[27] There, a shareholder of a Delaware corporation brought a standard derivative action, challenging the fairness of an interested transaction between the corporation and the corporation's majority stockholder. Thereafter, the corporation entered into a merger with an unaffiliated third party acquirer, in which the acquired corporation became a wholly owned subsidiary, and the plaintiff became a shareholder, of the acquiring corporation. The suit was later dismissed for lack of standing with leave to amend. The plaintiff amended her complaint to allege that the merger fell within the "fraud" exception of *Lewis v. Anderson*.[28] Importantly, however, the plaintiff did not purport to assert her claim double derivatively on the parent's behalf.[29] Affirming the dismissal of the amended complaint, this Court held that the fraud allegations were legally inadequate. We emphasized, however, that "the plaintiff did not lack any remedy to pursue her derivative claims [because] the plaintiff might have been able to bring a post-merger double derivative suit but made no attempt to file such an action."[30] Thus, *Lewis v. Ward*, like *Rales v. Blasband*, reaffirmed the vitality of resorting to a double derivative remedy in appropriate circumstances.

\*       \*       \*

The foregoing legal background shows that Delaware case law clearly endorses the double derivative action as a post-merger remedy. It also shows that to date this Court has determined some, but not all, of the procedural requirements that must be satisfied for a shareholder to proceed double derivatively.[31] The question certified to us by the Southern District, to which we now turn, asks us to address whether the procedural require-

25. *Rales v. Blasband*, 634 A.2d at 934.

26. *Id.*

27. 852 A.2d 896.

28. *Id.* at 904–05.

29. *Id.* at 900.

30. *Id.* at 906.

31. In *Rales* this Court did identify two of those requirements, both relating to a pre-suit demand. With respect to the subsidiary, we held that "[a] plaintiff in a double derivative suit is still required to satisfy the *Aronson [v. Lewis]* test in order to establish that demand on the *subsidiary's* board is futile." *Rales*, 634 A.2d at 934 (emphasis in original). With respect to the parent company, we held that a plaintiff seeking to sue double derivatively must plead facts with sufficient particularity to create a reason to doubt that "as of the time the complaint is filed, the [parent company] board of directors could have properly exercised its independent and disinterested business judgment in responding to a [Court of Chancery Rule 23.1] demand. If the derivative plaintiff satisfies this burden, then demand will be excused as futile." *Id.* And, in *Sternberg*, we held that the parent and the subsidiary corporations are both indispensable parties to a double derivative suit. 550 A.2d at 1124. *But see In re Sunstates Corp. S'holder Litig.*, C.A., 2001 WL 432447 at \*1 (Del.Ch. Apr. 18, 2001) (suggesting that where the parent is a Delaware corporation and the subsidiary is a foreign corporation, the subsidiary might not be an indispensable party to a double derivative suit). Even so, this Court has not yet addressed the (argued-for) procedural requirements raised by the question certified to us in this proceeding.

ments advocated by the defendants are mandated by Delaware law.

## B. *The Legal Issue Analyzed*

■ As earlier noted, the defendants' new argument in the Southern District action generates the issue presented: whether, have standing to assert Merrill Lynch's pre-merger claims double derivatively, the plaintiffs must demonstrate that at the time of the alleged wrongdoing at Merrill Lynch, (i) they owned stock in BofA and (ii) BofA owned stock in Merrill Lynch. The defendants advocate those same requirements to us in this proceeding.

The defendants' entire support for their position consists of two things: a conceptual argument and a 2004 Court of Chancery decision, *Saito v. McCall*.[32] The defendants' conceptual argument is premised on a model of a double derivative action as being two separate derivative lawsuits, one stacked on top of the other. As defendants describe it:

> [A] double derivative action could be viewed as two lawsuits in one: (i) a derivative action brought by the stockholder of the parent corporation through which the parent-stockholder gains authority over the parent corporation's litigation rights from the parent's board of directors; and (ii) a second derivative action on behalf of the parent corporation as stockholder of the subsidiary in which the parent corporation, qua stockholder and acting through the stockholder-plaintiff, takes control of the subsidiary's litigation rights from the subsidiary's board of directors.[33]

No decision by this Court validates this *a priori* model of a double derivative action. For the reasons next discussed, we conclude that the defendants' model is conceptually flawed, and that the *Saito* decision, to the extent it bears on the issue presented here, misapplies Delaware law. Accordingly, the certified question must be answered in the negative.

Because the defendants' model of a double derivative suit is the foundation of their litigating position, one would expect that their brief would expose the chain of deductive reasoning that flows from its premise to arrive at its conclusion. Regrettably, that reasoning is nowhere found in the defendants' brief. As best as we can gather, the defendants' logic proceeds as follows: Based on the "two derivative lawsuits in one" model, a double derivative action must be conceptualized as both a standard derivative action by BofA (through the plaintiffs) asserting a claim on Merrill Lynch's behalf, on which there is superimposed an action asserting that claim derivatively on BofA's (the new owner's) behalf. That being the case, all the procedural requirements for bringing each derivative action must be independently satisfied. This means that the plaintiffs must demonstrate: (1) their ownership of BofA stock at the time of the alleged pre-merger wrongdoing (to have standing to sue derivatively on BofA's behalf), and (2) BofA's (pre-merger) ownership of Merrill Lynch shares at the time of the alleged wrongdoing (for BofA to satisfy the "continuing ownership" requirement to sue on Merrill Lynch's behalf).

The infirmity in this reasoning is that Delaware law mandates neither requirement. Therefore, the model collapses.

---

**32.** 2004 WL 3029876 (Del.Ch. Dec. 20, 2004) (*"Saito"*).

**33.** Appellees' Answering Brief, at 21–22. Elsewhere in their brief, the defendants argue that their "two lawsuits in one" model is the approach mandated by Delaware law.

### (1) Conceptual Flaws in Defendants' Model

*First,* as Judge Rakoff correctly observed in his Memorandum Order, "[s]uch requirements would render double derivative lawsuits virtually impossible to bring except in bizarrely happenstance circumstances."[34] Yet, our precedents not only validate but also encourage the bringing of double derivative actions in cases where standing to maintain a standard derivative action is extinguished as a result of an intervening merger.[35] Unless a positive rule of law so requires, this Court should not undermine its own precedents by imposing procedural requirements that effectively would defeat that remedy. Other than the *Saito* decision, which we conclude misapplies Delaware law, no Delaware decision or statute imposes those requirements.

*Second,* the fact that requirement (2) finds no support in Delaware case or statutory law should come as no surprise, because any such requirement would run afoul of *Lewis v. Anderson* and its progeny.[36] Requirement (2)—that BofA must have owned Merrill Lynch stock at the time of the pre-merger wrongdoing—incorrectly presupposes that to be legally capable of enforcing Merrill Lynch's premerger claim, BofA must proceed *derivatively* against the persons who were Merrill Lynch directors at the time of the

alleged wrongdoing. That assumption ignores the legal precept, confirmed in *Lewis v. Anderson* and its progeny, that as a result of the merger, Merrill Lynch's claim becomes the property of BofA as a matter of statutory law.[37] As the sole owner of Merrill Lynch, BofA is not required to proceed derivatively; it may enforce that claim by the direct exercise of its 100 percent control.

To illustrate why this must be the correct result, suppose (hypothetically) that the merger is structured as a two party transaction in which Merrill Lynch disappears and the surviving corporation is BofA. In that case, because Merrill Lynch would no longer exist, BofA could not—and would not be required to—sue derivatively on Merrill Lynch's behalf. As sole owner of the (former) Merrill Lynch claim, BofA could sue directly and in its own name.[38] BofA would not be required to own any Merrill Lynch shares before the merger occurred.

No different result should obtain where, as here, the merger is structured as a three party transaction with Merrill Lynch ending up as BofA's wholly owned subsidiary. Because BofA owns 100 percent of the shares of its (post-merger) Merrill Lynch subsidiary, there is no basis in law or logic to treat BofA as if it were a minority shareholder of Merrill Lynch and require it to sue derivatively to enforce

**34.** *In re Merrill Lynch & Co., Inc., Sec., Derivative & ERISA Litig.,* 692 F.Supp.2d at 373.

**35.** *See Lewis v. Ward,* 852 A.2d at 906.

**36.** The holding in *Lewis v. Anderson* is settled Delaware law and has been consistently followed by Delaware courts. *See Kramer v. W. Pac. Insdus., Inc.,* 546 A.2d 348, 349 (Del. 1988); *Lewis v. Ward,* 852 A.2d at 898 and 903–04; *Feldman v. Cutaia,* 951 A.2d 727, 735 (Del.2008).

**37.** *Lewis v. Anderson,* 477 A.2d at 1050–51.

**38.** *Id.* ("If New Conoco were to proceed against old Conoco's former management and obtain recovery ... New Conoco would simply be pursuing Old Conoco's assets and minimizing its liabilities."); *Lewis v. Ward,* 852 A.2d at 901 ("When a merger ... eliminates [a shareholder's] standing to pursue derivative claims on behalf of that company [t]hose derivative claims pass by operation of law to the surviving corporation, which then has *the sole right and standing* to prosecute the action.") (emphasis added).

Merrill Lynch's pre-merger claim. BofA's sole ownership, alone and without more, empowers and entitles BofA, acting through its own board of directors or authorized officers, to use its direct control to cause its wholly owned subsidiary, Merrill Lynch, to do what is necessary to enforce Merrill Lynch's pre-merger claim.[39] To accomplish that, the only Merrill Lynch shares BofA would have to own would be those it acquired as a result of the merger.[40]

*Third*, requirement (1) of the defendants' double derivative model—that the original derivative plaintiffs must have owned BofA shares at the time of the alleged wrongdoing at Merrill Lynch—is also fatally flawed. To the extent the defendants argue that that requirement flows from the contemporaneous ownership requirement of Section 327, the argument misapplies that statute. As discussed above, BofA is not required to have been a shareholder of Merrill Lynch at the time of the alleged wrongdoing to enforce Merrill Lynch's pre-merger claim. In a double derivative action the plaintiffs stand in the shoes of BofA; that is, they are enforcing BofA's *post-merger* right, as 100 percent owner, to prosecute Merrill Lynch's *pre-merger* claim. Just as BofA is not required to have owned Merrill Lynch shares at the time of the alleged wrongdoing, neither are the plaintiffs required to have owned BofA shares at that point in time. It suffices that the plaintiffs own shares of BofA at the time they seek to proceed double derivatively on its behalf.[41] For the plaintiffs in this specific case, that requirement is easily satisfied, because they acquired their BofA shares in the merger, and their double derivative claim is based on post-merger conduct by the BofA board, *viz.*, its failure to prosecute Merrill Lynch's pre-merger claim, which BofA now (indirectly) owns.[42]

*Fourth*, and finally, the preceding analysis answers the defendants' policy argument that unless we conclude that their model represents Delaware law, allowing the plaintiffs' post-merger double derivative action to proceed would disrespect the corporate separateness of BofA and Merrill Lynch, subvert the rationale of *Lewis*

---

**39.** *See Weinstein Enterprises, Inc. v. Orloff*, 870 A.2d 499, 508–09 (Del.2005) (discussing control when a subsidiary is not wholly owned).

**40.** Nor would this result disrespect the status of Merrill Lynch as a separate entity, or constitute a *de facto* piercing of the corporate veil, as the defendants suggest. Merrill Lynch's corporate separateness would not be diminished by action taken by its sole owner directing Merrill Lynch's managers to file a lawsuit. And, the separate entity status of BofA is respected, because the plaintiffs must show that a demand on BofA's board would be futile, *i.e.*, that BofA's board is incapable of making an impartial business judgment as to whether or not to enforce Merrill Lynch's pre-merger claim.

**41.** Nor does defendants' argument that this result would violate the continuous ownership requirement have merit. That requirement is satisfied because the plaintiffs must own their BofA shares continuously throughout the pendency of the double derivative action.

**42.** As an alternative argument, the plaintiffs further contend that even if the contemporaneous ownership requirement embodied in § 327 requires plaintiffs to have owned BofA stock at the time of the wrongdoing complained of, that does not deprive them of standing to sue double derivatively, because by its terms, § 327 is also satisfied if the plaintiffs' BofA shares "devolve[d] upon them by operation of law." The defendants argue, in response, that the "devolve by operation of law" exception of § 327 does not apply or otherwise operate in plaintiffs' favor in these circumstances. We note these arguments, but do not address them, other than to point out that the "devolve by operation of law" concept embodied in § 327 plays no role in our analysis or decision.

v. *Anderson,* and undermine the policy underlying Section 327 (to prevent abuse of the derivative action remedy).[43] This argument lacks merit, because it rests upon an unstated—and incorrect—premise, namely, that the post-merger double derivative action must be viewed as a *de facto* continuation of the pre-merger original derivative action, only with a different label.

If that premise were correct, then the defendants' position might have merit, because allowing the original derivative action to proceed would undo the plaintiffs' loss-of-standing recognized by *Lewis v. Anderson,* and arguably would constitute, *de facto,* a piercing of BofA's corporate veil. The defendants' argument is flawed, however. A post-merger double derivative action is not a *de facto* continuation of the pre-merger derivative action. It is a new, distinct action in which standing to sue double derivatively rests on a different temporal and factual basis—namely, the failure of the BofA board, post-merger, to enforce the premerger claim of its wholly-owned subsidiary.[44] In this quite different structure, the policies favoring both the preservation of the corporate separateness of the parent and subsidiary and the prevention of abusive derivative suits are fully respected. That is because the double derivative suit cannot go forward except in the unusual case where the parent company board is shown to be incapable of deciding impartially whether or not to enforce the claim that the parent company now (indirectly) owns. Like their conceptual arguments, the defendants' policy conten-

tions misconceive the nature of a post-merger double derivative action.

\*     \*     \*

To summarize, the defendants' argued-for double derivative model is the conceptual foundation upon which their litigating position rests. That model finds no support in Delaware statutory law or, with one exception *(Saito),* Delaware case law. Because that model—if validated—would effectively eviscerate the double derivative action as a meaningful remedy, the defendants' position must be rejected on that basis alone.

### (2) *The Saito Decision*

That leaves *Saito* as the defendants' sole legal support for their position. We conclude that, insofar as *Saito* addresses the issue presented here, it does not represent sound Delaware law.

*Saito* was a stockholder's derivative action brought in the Court of Chancery in April 1999, to recover damages allegedly inflicted on: (i) the former HBO & Company (HBOC), (ii) McKesson Corporation (McKesson), and (iii) McKesson HBOC, the combined company after a stock-for-stock merger of those two companies in January 1999. The central claims were that: HBOC's directors and senior officers presided over a fraudulent accounting scheme; McKesson's officers and directors learned of that fraudulent scheme while conducting due diligence in connection with the merger, but the directors nonetheless approved the merger; and that after the merger the McKesson HBOC

---

43. *Lewis v. Anderson,* 477 A.2d at 1046.

44. *See In re Gen. Instrument Corp. Sec. Litig.,* 2000 WL 1742120, at \*4 (N.D.Ill. Nov. 22, 2000) (holding that the "Court's insistence upon formal pleading [of a double derivative claim] is not a meaningless technical exercise.... [A] double derivative claim ... is a very different creature from the standard de-

rivative claim.... A double derivative claim requires allegations and, ultimately, proof of very different facts."). To be sure, the pre-merger original derivative action and the post-merger double derivative action do share one element in common: the underlying merits claim. But that is all.

board acted too slowly in rectifying the accounting problems at HBOC.[45] None of the plaintiffs were HBOC shareholders at the time the complaint was originally filed in April 1999. Two of the plaintiffs were HBOC shareholders before the merger and became McKesson HBOC stockholders in the January 1999 stock-for-stock merger with McKesson.[46]

The *Saito* opinion decided a motion to dismiss the fifth amended complaint, which alleged thirteen counts of wrongdoing. Only one of those counts—Count VI—is relevant to the issue presented here. Count VI alleged (*inter alia*) that the former directors of HBOC violated their fiduciary duty by failing to monitor HBOC's internal accounting practices and to disclose HBOC's false financial statements before the merger. Count VI also asserted that claim double derivatively on behalf of McKesson HBOC and of post-merger HBOC, which was McKesson HBOC's wholly-owned subsidiary.[47]

That claim, originally alleged as a standard derivative claim in the second amended complaint, had previously been dismissed for failure to satisfy the continuous ownership requirement, because the plaintiffs were not shareholders of HBOC at the time the action was filed. The Chancellor dismissed the claim without prejudice to replead that the merger fell into one of the two exceptions recognized in

*Lewis v. Anderson.*[48] As repled, Count VI alleged in conclusory terms that the merger had been fraudulently structured to eliminate the plaintiffs' ability to assert pre-merger claims on behalf of HBOC.[49] The Chancellor found that, as repled, the claim failed adequately to allege that the merger had been designed to thwart shareholder derivative claims.[50]

The plaintiffs argued, nonetheless, that they had standing for an independent reason, namely, that Count VI was a double derivative claim which, as a result of the merger, they had standing to bring as McKesson HBOC shareholders.[51] The Chancellor disagreed, holding that to have standing to sue double derivatively on behalf of McKesson HBOC, (1) the plaintiffs must have been shareholders of McKesson HBOC at both the time of the alleged wrong and at the time they commenced their lawsuit, and (ii) McKesson HBOC must have been a shareholder of HBOC at the time of the alleged wrong. Those requirements (the court held) were not satisfied because "[the] plaintiffs ... were not McKesson HBOC shareholders before January 12, 1999 [the date of the merger], so they cannot bring a derivative suit, double or otherwise[;]"[52] and, moreover, "[the] plaintiffs have failed to allege that McKesson HBOC was a shareholder of HBOC at the time the alleged harm oc-

---

**45.** *Saito*, 2004 WL 3029876, at *1.

**46.** *Id.* at *4. Apparently, the third plaintiff purchased his McKesson stock after the McKesson board approved the merger in 1998 but before the merger closed. *Id.*

**47.** *Id.* at *8.

**48.** The dismissal of that claim (and others) was the subject of the Chancellor's opinion in *Ash v. McCall*, 2000 WL 1370341 (Del.Ch. Sep.15, 2000).

**49.** *Saito*, 2004 WL 3029876, at *8.

**50.** *Id.*

**51.** *Id.*

**52.** *Id.* at *9. The Chancellor noted that McKesson HBOC's shareholders could bring an action against McKesson HBOC's board, if it fails to pursue Court VI (assuming it states a claim), because "McKesson HBOC inherited HBOC's choses in action, including Count VI." *Id.* at *9 n. 80 (citing *Lewis v. Anderson*, 477 A.2d at 1050).

curred." [53]

*Saito* is the only case supporting the defendants' position that, where a merger has deprived a shareholder of standing to continue a pending standard derivative suit, to have standing to sue double derivatively the plaintiffs must have owned stock in both the acquired and the acquiring corporation, and the acquiring corporation must have owned shares of the acquired corporation, all at the time of the alleged wrongdoing. To the extent *Saito* so holds, the issue becomes whether that holding is sound Delaware law. We conclude that it is not. No reasoning is articulated to support *Saito's* conclusory holding. Unless the defendants' model of a double-derivative action is valid, *Saito* cannot be correct. For the reasons earlier discussed, that model is legally infirm.

We do note, in fairness to the author of *Saito*, that it is understandable why his holding regarding double derivative standing was expressed in conclusory form. Four years earlier, that same highly respected jurist decided *Ash v. McCall*, [54] which involved an earlier dismissal motion, and similar standing issues, in the same case. In *Ash* the defendants moved to dismiss an earlier version of Count VI for lack of standing. The plaintiffs argued that despite having lost their HBOC shareholder status in the McKesson HBOC merger, they still had standing to continue pursuing their standard derivative claim. The plaintiffs relied on the Third Circuit decision in *Blasband v. Rales*, which (the plaintiffs argued) upheld standing in virtually identical circumstances. The Chancellor disagreed. Pointing to *In re First Interstate Bancorp Consol. S'holder Litig.*,[55] where the Court of Chancery had held that the Third Circuit *Blasband* decision was inconsistent with *Lewis v. Anderson*,[56] the *Ash* Court stated:

> *First Interstate* clearly expressed the Delaware Courts' rejection of the Third Circuit's holding in *Blasband v. Rales* that the combination of a direct pre-merger equity interest (in the subsidiary) and a direct but diluted post-merger equity interest (in the surviving corporation) is sufficient to meet the common law continuous ownership requirement necessary to prosecute pre-merger derivative claims.... [Although t]he Third Circuit's view .... has been characterized by commentators as "persuasive[,]" ... [n]onetheless, it is not the law in Delaware.[57]

---

53. *Saito*, 2004 WL 3029876, at *9 n. 82.

54. 2000 WL 1370341.

55. 729 A.2d 851 (Del.Ch.1998), *aff'd. sub nom. Bradley v. First Interstate*, 748 A.2d 913 (Table), 2000 WL 383788 (Del. Mar. 21, 2008) (*"First Interstate"*).

56. In *Lewis v. Ward* this Court also recognized that *First Interstate* "correctly held" that "[t]he Third Circuit's decision in *Blasband* is both inconsistent with the clear holding of *Lewis v. Anderson* and immaterial to the decision in this case as, at most, it would recognize [the plaintiff's] ability to proceed double derivatively in the name of [the acquiring company], something which [the plaintiff] does not purport to do." 852 A.2d at 903 (quoting *First Interstate*, 729 A.2d at 868 n.

18). We reiterate that the Third Circuit's *Blasband* opinion is inconsistent with Delaware law (and, particularly, *Lewis v. Anderson* and its progeny) to the extent that it would recognize post-merger equitable standing to pursue a *standard derivative* action addressing pre-merger misconduct. *See Blasband v. Rales*, 971 F.2d at 1046 n. 14. The Third Circuit's *Blasband* decision, however, is not inconsistent with Delaware law insofar as it recognizes the availability of a *double derivative* action as a post-merger remedy.

57. *Ash*, 2000 WL 1370341 at *13. Having so held, however, the Chancellor in *Ash* added, in a footnote that foreshadowed Judge Rakoff's observation in this case (*see* n. 6, *supra*):

> Quite frankly, I also find the Third Circuit's view on this issue persuasive. To be sure, it

That is, the Court in *Saito* felt no need to articulate the requirements for a double derivative action with more particularity because the rationale driving the result in *Saito* had been explained in *Ash,* four years earlier. *Ash,* however, involved a standard derivative action. By implicitly extending the *Ash* rationale to double derivative actions, *Saito* misapplied Delaware law. To that extent, *Saito* is inconsistent with the reasoning and conclusions in this Opinion and is overruled.

## V. CONCLUSION

For the reasons set forth in this Opinion, we answer the question certified to us in the negative.

is not consistent with the Delaware Supreme Court's holding in *Lewis v. Anderson* and, for that reason, I am not free to follow it. Nonetheless, I do not think that a principled economic argument exists for denying standing to a former HBOC shareholder who continues to hold an equity interest, albeit diluted, in the HBOC subsidiary through the controlling interest of the combined entity, McKesson HBOC. Like the Third Circuit in *Blasband,* I do not understand how the concerns that animate § 327 are implicated in stock-for-stock mergers of this kind.... But if this area of Delaware law is to be made consistent with basic economic principles, as well as fundamental principles of equity and fairness, it will have to come from the Delaware Supreme Court.
*Id.* at *13, n. 47.