# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| YOUNG WOMEN'S CHRISTIAN ASSOCIATION OF ROCHESTER AND MONROE COUNTY, | ) ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | C.A. No. 2024-1264-JTL |
| HATTERAS FUNDS, LP, HATTERAS INVESTMENT PARTNERS, LP, DAVID B. PERKINS, H. ALEXANDER HOLMES, STEVEN E. MOSS, GREGORY S. SELLERS, THOMAS MANN, BENEFICIENT, and BRADLEY K. HEPPNER, | ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) ) | |
| and. | ) ) | |
| HATTERAS MASTER FUND, L.P. and HATTERAS CORE ALTERNATIVES TEI INSTITUTIONAL FUND, L.P., | ) ) ) ) | |
| Nominal Defendants. | ) | |

**OPINION ADDRESSING RULE 23.1 MOTION**

Date Submitted: December 5, 2025
Date Decided: March 31, 2026

William M. Alleman, Jr., MELUNEY ALLEMAN & SPENCE, LLC, Lewes, Delaware; Aaron T. Morris, Andrew W. Robertson, William H. Spruance, MORRIS KANDINOV LLP, New York, New York; *Attorneys for Plaintiff.*

Elena C. Norman, Richard J. Thomas, YOUNG CONAWAY STARGATT & TAYLOR LLP, Wilmington, Delaware; Melanie B. Dubis, Corri A. Hopkins, PARKER POE ADAMS & BERNSTEIN LLP, Raleigh, North Carolina; *Attorneys for Defendants David B. Perkins and Hatteras Investment Partners, LP (f/k/a Hatteras Funds, LP).*

Stephen B. Brauerman, Brett M. McCartney, BAYARD, P.A., Wilmington, Delaware; Joshua L. Solomon, Phillip Rakhunov, POLLACK SOLOMON DUFFY LLP, Boston, Massachusetts; *Attorneys for Defendants H. Alexander Holmes, Steven E. Moss, Gregory S. Sellers, and Thomas Mann.*

Stephen C. Norman, Ellis H. Huff, Samuel G. Gustafson, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; *Attorneys for Defendant Beneficient*

Bradley K. Heppner, Dallas, Texas; *Defendant, Pro Se*

Scott J. Leonhardt, Jared T. Green, Katherine R. Welch, ESBROOK P.C., Wilmington, Delaware; Jennifer K. Van Zant, Greg Gaught, BROOKS, PIERCE, MCLENDON, HUMPHREY & LEONARD LLP, Raleigh, North Carolina; *Attorneys for Nominal Defendants Hatteras Master Fund, L.P. and Hatteras Core Alternatives TEI Institutional Fund, L.P.*

**LASTER, V.C.**

An investment manager oversees a group of investment funds (the "Investment Manager"). The principal investment fund is organized as a Delaware limited partnership and provides access to alternative investments through a fund-of-funds strategy (the "Master Fund"). One of its fundamental investment policies requires maintaining diversification by prohibiting the Master Fund from investing more than 25% of its assets in a single issuer (the "Diversification Policy").

The Master Fund does not accept investments directly from third-party investors. It uses a master-feeder structure in which feeder funds (the "Feeder Funds") raise capital and channel it into the Master Fund.[1] The Master Fund and the Feeder Funds have substantially identical limited partnership agreements. An affiliate of the Investment Manager serves as the general partner of each fund, but delegates its managerial authority over the business and affairs of the fund to a board of directors (the "Board" or the "Directors"). The limited partnership agreements provide that the Directors owe the same fiduciary duties as directors of a Delaware corporation. Rather than fully exculpating the Directors from liability for breaches of duty, the limited partnership agreements preserve liability for gross negligence.

After an initial period of success during which assets under management ("AUM") grew dramatically, the Master Fund experienced a similarly lengthy period

[1] *See* Henry Ordower, *Demystifying Hedge Funds: A Design Primer*, 7 U.C. Davis Bus. L.J. 323, 343–45 (2007) (describing master-feeder structure); *Fund Director's Guidebook*, 52 Bus. Law. 229, 252–53 (1996) (same).

of withdrawal requests. The Investment Manager met those requests by having the Feeder Funds engage in periodic tender offers.

By 2021, the Master Fund's AUM had fallen by half. The Investment Manager's fees had fallen even further, and because of a high-watermark limitation on its performance fee, the Investment Manager was unlikely to see any performance fees for years to come. The Investment Manager decided to wind down the Master Fund and start over with a new fund.

To achieve that goal, the Investment Manager entered into a transaction with a startup fund-advisory firm (the "Buyer") that focused on helping investment managers address liquidity issues. In the resulting transaction, the Investment Manager sold all of the Master Fund's assets to the Buyer (the "Asset Sale"). In return, the Master Fund received illiquid (and inferably overvalued) limited partner units in the Buyer (the "Preferred Units"). The Buyer also promised to provide financial support for the Investment Manager's future funds.

In substance, the Master Fund purchased a single security—the Preferred Units—in return for its diversified pool of assets. The closing of the Asset Sale resulted in the Master Fund violating the Diversification Policy by concentrating 100% of its AUM in a single security. But the Asset Sale conferred a unique benefit on the Investment Manager in that it converted the Master Fund's AUM into a form of round-trip financing for future funds.

And there was more. Red flags festooned the Buyer. Its CFO had resigned over concerns about interested transactions. Two audit firms had terminated their

engagements. Four independent directors had resigned. The Security and Exchange Commission was investigating the firm's accounting practices. And goodwill arising from the interested transactions comprised 84% of the assets on its balance sheet.

When the Investment Manager presented the Asset Sale to the Board, the Directors approved it immediately. They did not receive a fairness opinion or consult with any outside advisors. After the Asset Sale closed, the Directors allowed the Investment Manager to send belated and misleading communications to the Feeder Fund investors.

The Board ostensibly approved the Asset Sale as part of a plan of liquidation for the Master Fund and its feeder funds (the "Dissolution Plan"). Yet after the Asset Sale, the Directors and the Investment Manager did not take any steps to pursue the Dissolution Plan. They also did not take any steps to protect the Master Fund against loss from its now-single investment in the Preferred Units.

Eighteen months later, the Buyer completed a de-SPAC transaction that converted the Preferred Units into publicly traded common stock valued at $8 per share. Although the Master Fund now held a liquid security, the Directors and the Investment Manager did not take any steps to diversify the Master Fund's assets, wind down its operations, or protect the Master Fund against loss from its singular investment.

In the months following the de-SPAC transaction, the Buyer wrote off the bulk of its goodwill. Its stock price plummeted, ultimately trading for pennies. The Master

3

Fund still has not sold any of the Buyer's shares. The Master Fund's AUM has fallen by 98%, with Feeder Fund investors bearing those losses.

Meanwhile, during the time that the Investment Manager and the Directors did nothing, the Master Fund continued to pay the Investment Manager an annual fee equal to 1% of its AUM, even though the Master Fund had gone from holding over 100 different funds to owning a single security. That arrangement yielded over $10 million for the Investment Manager.

One of the investors in a Feeder Fund asserted double-derivative claims on behalf of the Master Fund. The defendants moved to dismiss those claims under Rule 23.1. They argue that the Feeder Fund lacks the ownership stake in the Master Fund necessary for the feeder fund investor to assert double-derivative claims. They also argue that the complaint fails to plead that demand would have been futile.

This decision denies the Rule 23.1 motion.

## I. FACTUAL BACKGROUND

The facts are drawn from the amended complaint (the "Complaint"), documents the Complaint incorporates by reference, and documents subject to judicial notice.[2] At this procedural stage, the court must credit the Complaint's well-pled allegations and draw all reasonable inferences in the plaintiff's favor.

---

[2] Citations in the form "Compl. ¶ ___" refer to paragraphs of the amended complaint, which is the operative pleading. Dkt. 29, Ex. 1. Citations in the form "HX ___ at ___" refer to exhibits to the transmittal affidavit of Richard J. Thomas. Dkts. 29, 30. Citations in the form "BX ___ at ___" refer to exhibits to the motion to dismiss

4

## A. The Fund Complex

The fund complex at the center of the case does business under the "Hatteras" trade name. In 2003, David B. Perkins cofounded the fund complex with the goal of establishing funds that would provide investors with access to alternative investment strategies—think of hedge funds and private equity funds—through a fund-of-funds approach. By pooling their capital through a fund of funds, smaller investors could attain levels of diversification similar to what larger investors could achieve.

The central management entity in the fund complex is the Investment Manager, formally known as Hatteras Funds, LP and now doing business as Hatteras Investment Partners, LP. [3] Perkins controls the Investment Manager, owns a majority of its equity, and serves as its President and CEO.

The fund complex's principal investment vehicle is the Master Fund, formally known as the Hatteras Master Fund, L.P. The Master Fund's investment goal is "to provide capital appreciation consistent with the return characteristics of the alternative investment portfolios of larger institutions . . . . [and] to provide capital

---

filed by the Buyer and its CEO. Dkt. 34. Page references cite to internal pagination whenever possible.

[3] *See* HX 2 (the "Prospectus") at 24. The caption names Hatteras Funds LP and Hatteras Investment Partners, LP as two separate entities, but they seem to be one in the same. Public filings like the Prospectus indicate that Hatters Funds LP conducted business for period as Hatteras Investment Partners, then changed its name to Hatteras Investment Partners, L.P. The complaint treats them as the same entity. So does the briefing. This decision takes that approach.

appreciation with less volatility than that of the equity markets."[4] The Master Fund told its investors that to achieve its investment goal, it typically would invest in approximately fifty different alternative investment products. At the time of the Asset Sale, the Master Fund had investments in around 125 different alternative investment products.

The Master Fund implemented its commitment to diversification through the Diversification Policy. That policy prohibits the Master Fund from investing "25% or more of the value of its total assets in the securities . . . of any one issuer."[5]

The Master Fund is a Delaware limited partnership, and is internal affairs are governed by its limited partnership agreement (the "LP Agreement"). An affiliate of the Investment Manager serves as the Master Fund's general partner,[6] but under the

---

[4] *See* Prospectus at 27; *see also id.* at 19.

[5] Compl. ¶ 38; *see also* Prospectus, Statement of Additional Information at 2.

[6] Formally, the general partner is Hatteras Investment Management LLC. *See* LP Agreement (cited as "LPA") art. I. The distinction between that entity and the Investment Manager is not important at this stage of the proceeding. *See In re USACafes, L.P. Litig.*, 600 A.2d 43, 47–48 (Del. Ch. 1991) (Allen, C.) (extending fiduciary duties to parties that controlled affiliate serving as general partner); *see also In re EZCORP Inc. Consulting Agreement Deriv. Litig.*, 2016 WL 301245, at *9 (Del. Ch. Jan. 25, 2016) ("An ultimate human controller who engages directly or indirectly in an interested transaction with a corporation is potentially liable for breach of duty, even if other corporate actors made the formal decision on behalf of the corporation, and even if the controller participated in the transaction through intervening entities."); *see generally S. Pac. Co. v. Bogert*, 250 U.S. 483, 488 (1919) (Brandeis, J.) ("The Southern Pacific contends that the doctrine under which majority stockholders exercising control are deemed trustees for the minority should not be applied here, because it did not itself own directly any stock in the old Houston Company; its control being exerted through a subsidiary, Morgan's Louisiana &

6

LP Agreement, the general partner has irrevocably delegated its rights and powers to manage the business and affairs of the Master Fund to the five-member Board. Perkins serves as Chair. The other Directors are H. Alexander Holmes, Steven E. Moss, Gregory S. Sellers, and Thomas Mann (the "Outside Directors").

None of the Outside Directors have affiliations with the fund complex other than through their directorships. But, as discussed later, they have served in their positions for decades and benefit from their association with Perkins and the Investment Manager.

Another affiliate of the Investment Manager serves as the Master Fund's investment advisor under a fund advisory agreement (the "Advisor Agreement").[7] The Advisor Agreement requires that the Investment Manager develop and monitor an investment program for the Master Fund, subject to Board oversight and fundamental investment policies like the Diversification Policy.

---

Texas Railroad & Steamship Company, which was the majority stockholder in the old Houston Company. But the doctrine by which the holders of a majority of the stock of a corporation who dominate its affairs are held to act as trustee for the minority does not rest upon such technical distinctions. It is the fact of control of the common property held and exercised, not the particular means by which or manner in which the control is exercised, that creates the fiduciary obligation.").

[7] Formally, the investment advisor is Hatteras Investment Partners LLC. LPA art. 1. Under the same authorities discussed in the preceding footnote, the distinction between that entity and the Investment Manager is not important at this stage of the proceeding.

The Advisor Agreement provides for both an annual fee and a performance fee. Because of the amount of losses the Master Fund has suffered, the Investment Manager is unlikely to see any performance fees for the foreseeable future.

## B.     The Feeder Funds

The Master Fund does not raise capital directly. The Master Fund and the Investment Manager instead use a common fund-industry structure in which feeder funds channel capital into the Master Fund.

Four Delaware limited partnerships serve as the Feeder Funds for the Master Fund. Each invests all of its assets in the Master Fund.

Each Feeder Fund has the same governance structure as the Master Fund, including the same general partner (the Investment Manager), the same investment advisor (the Investment Manager), and the same board of directors (the Board). Each has the same investment objectives and fundamental policies as the Master Fund, including the Diversification Policy.

The four Feeder Funds come in two pairs. One pair targets investors generally and consists of the Hatteras Core Alternatives Fund, L.P. and the Hatteras Core Alternatives TEI Fund, L.P. (the "Original Feeder Funds"). A second pair targets institutional investors and consists of the Hatteras Core Alternatives Institutional Fund, L.P. and the Hatteras Core Alternatives TEI Institutional Fund, L.P. (the "Institutional Feeder Funds").

The two "TEI" funds are for tax-exempt investors. They invest in the Master Fund through intervening off-shore blocker entities designed to prevent the tax-

8

exempt funds from accumulating unrelated business income. The offshore blocker entities in turn invest all of their assets in the Master Fund. The blocker entities have no investment discretion and make no independent decisions. For purposes of legal analysis, the parties ignore the blocker entities. So does this decision.

The following diagram from the Prospectus depicts the basic fund structure:



The Master Fund and the Feeder Funds are registered as closed-end, diversified, investment management companies under the Investment Company Act of 1940 (the "1940 Act"). The Feeder Funds' status as close-end funds means that investors have minimal liquidity opportunities. In an open-end fund, an investor can redeem its units at the end of each trading day at the fund's net asset value. Not so in a closed-end fund. Many closed-end funds mitigate that limitation by listing their

limited partnership interests, known as units, on a public exchange. The Feeder Funds' units do not trade publicly, nor are their units freely transferrable.

The only meaningful opportunity for liquidity that Feeder Fund investors had was to ask to have their units repurchased. To address repurchase requests, the Investment Manager historically caused the Feeder Funds to make periodic tender offers for units, usually quarterly. The Investment Manager determined when to make a tender offer and how many units to repurchase, although always less than 20% of the units outstanding. Typically, the Investment Manager capped the number of units accepted for repurchase at 5% of the outstanding units. If investors tendered more, then the repurchases were prorated. Because of the limit on repurchases and the reality of proration, it could take multiple quarters for an investor to exit.

## C.     The Road To The Asset Sale

The Investment Manager launched the Master Fund and the Original Feeder Funds in 2003. The Investment Manager added the Institutional Feeder Funds in 2007. AUM grew rapidly, peaking in 2013 at more than $624 million. The Investment Manager's fees grew as well, topping $15.2 million.

After 2013, the flow of investment dollars reversed. The Master Fund experienced a steady stream of tender requests as investors sought to exit. Because of the Master Fund's fund-of-funds structure, the tender requests created liquidity pressure. Investments in alternative fund providers are illiquid, so the Master Fund could not readily sell investments to generate capital for the tender offers.

10

By 2020, AUM had fallen by more than half. The Investment Manager's fees had fallen even further to around $3.9 million per year. With tender requests continuing, Perkins decided to shut down the existing funds and start over with new funds. Ideally, however, he would use the Master Fund's remaining AUM—valued at approximately $305 million—to seed the new funds.

The solution came through a transaction with the Buyer, then known formally as The Beneficient Company Group, L.P. It, too, was a Delaware limited partnership. Bradley K. Heppner is its founder, Chief Executive Officer, and Chairman.

The Buyer provides liquidity solutions for illiquid alternative investments— exactly what Perkins needed. At the time, however, the Buyer was still a startup. It had only been in business for four years and was not yet profitable. The Buyer also did not expect to generate positive cash flow from its operations in the near term. It needed capital to expand.

Much of the Buyer's value was attributable to goodwill. Its financial statements for 2020 identified $2.82 billion in total assets. Goodwill accounted for $2.36 billion, or 84%.

That goodwill largely resulted from a series of interested transactions between the Buyer and GWG Holdings, Inc., its former parent. GWG specialized in selling bonds backed by life settlements. Between 2017 and 2020, the Buyer and GWG engaged in a series of transactions that resulted in the Buyer and GWG inverting their relationship. After those transactions, the Buyer controlled GWG.

11

The GWG transactions raised red flags. In July 2019, the Buyer's CFO resigned and expressed concern that Heppner was using the GWG transactions to misappropriate funds. In October 2019, four outside directors who served on both the Buyer and GWG boards resigned after objecting to the GWG transactions. During that year, two successive audit firms terminated their engagements. In October 2020, the SEC's Division of Enforcement subpoenaed GWG's documents as part of an investigation into its accounting practices, including the consolidation of GWG's financial statements with the Buyer's and the legitimacy of the goodwill valuation. In response to the SEC investigation, GWG issued a statement expressing substantial doubt about its ability to continue as a going concern. GWG also announced that its prior financial reports should not be relied upon and that it would restate its financials for 2019 and three quarters of 2020.

## D.    The Asset Sale

Despite the red flags surrounding the Buyer, the Investment Manager negotiated the Asset Sale. In that transaction, the Buyer acquired all of the Master Fund's assets, comprising approximately $305 million in diversified holdings. In return, the Master Fund received Preferred Series B-2 units in the Buyer. In addition, the Buyer agreed to support the Investment Manager by providing seed capital for new funds.[8] Ironically, the strength of the assets the Buyer acquired in the Asset Sale would help underwrite that support. The Asset Sale thus enabled the Investment

---

[8]*Id.* ¶¶ 4, 69, 87.

Manager to round-trip the Master Fund's AUM and use it to seed new investment funds.

On December 7, 2021, the Investment Manager presented the Asset Sale to the Board for the first time. The Investment Manager pitched the transaction as the first step in the Dissolution Plan that would result in the Master Fund dissolving and returning capital to investors. The Board approved the Asset Sale that same day. The Board did not secure a fairness opinion or consult with outside advisors.

The Asset Sale dramatically changed the composition and risk profile of the Master Fund's investments. Before the Asset Sale, the Master Fund held a range of alternative investments managed by advisors who employed diverse strategies across different industries and asset classes. After the Asset Sale, the Master Fund held limited partnership units in a single entity—the Buyer—with an unproven track record and a host of red flags. The Preferred Units were not a liquid investment; they would only convert into salable equity upon an "initial listing event," defined as a public offering or merger with a public company.[9] The Board and the Investment Manager had no control over when—if ever—the Buyer would engage in an initial listing event.

The Asset Sale violated the Diversification Policy, which prevented the Master Fund from investing more than 25% of its AUM in a single security. The Board could only approve a departure from the Diversification Policy with supermajority

---

[9] BX B at 5.

13

unitholder approval. The Board did not seek unitholder approval for the Asset Sale or for the departure from the Diversification Policy. The Investment Manager also did not announce that it was exploring alternatives or give investors a chance to tender their units before the Board approved the Asset Sale. After approving the Asset Sale, the Board cancelled all pending tender requests.

### E. Investors Learn About The Asset Sale.

On December 30, 2021, the Investment Manager sent a letter describing the Asset Sale to the Feeder Fund investors. The letter implied that a blue-chip institutional investor was buying the Master Fund's assets for cash and that the Master Fund would dissolve and return cash to its investors. The letter did not accurately describe the Buyer or explain that the Master Fund was accepting consideration in the form of the Preferred Units. The letter did not disclose that the Buyer had agreed to provide financial support for the Investment Manager's future funds.

For the next eighteen months, the Investment Manager and the Board did nothing to pursue the Dissolution Plan, diversify the Master Fund's holdings, correct the violation of the Diversification Policy, or otherwise address the risks posed to the Funds from holding a single illiquid security in an unproven issuer surrounded by red flags. The Master Fund simply held the Preferred Units.

### F. The Avalon Transaction

On September 21, 2022, the Buyer announced that it had agreed to a de-SPAC transaction with Avalon Acquisition, Inc., a special purpose acquisition vehicle (the

14

"Avalon Transaction"). The Buyer would emerge from the Avalon Transaction as a publicly traded corporation organized under Nevada law. As part of the Avalon Transaction, the Preferred Units that the Master Fund held would convert into shares of the Buyer's common stock valued at $8 per share.

On December 9, 2022, the Investment Manager sent another letter to the Feeder Fund investors. This letter explained for the first time that the Master Fund had exchanged its investments for the Preferred Units. The letter also referenced the Avalon Transaction, but did not explain that the Preferred Units would convert into publicly traded shares of the Buyer's common stock.

The Avalon Transaction closed on June 8, 2023, and the Master Fund's Preferred Units converted into the Buyer's shares. The Master Fund now had a liquid security that it could sell or distribute to wind down the Master Fund and Feeder Funds.

The Investment Manager sent a third letter to the Feeder Fund investors. This letter reported that the Preferred Units had been exchanged for common stock in the Buyer valued at $8 per share.

G.     **The Buyer's Stock Plummets In Value.**

After the Avalon Transaction closed, the Investment Manager did not diversify its holdings. The Master Fund continued to hold only the Buyer's common stock.

On August 14, 2023, the Buyer issued its first Form 10-Q after the Avalon Transaction. In its financial statements, the Buyer wrote down the value of its goodwill—by far the largest asset on its balance sheet—from $2.37 billion to $1.27

billion. In the next quarter, the Buyer wrote down its goodwill by another $306.7 million. In the next quarter after that, the Buyer wrote down its good will by another $883.2 million. During its first seven months as a public company, the Buyer wrote off almost all of the $2.37 billion in goodwill, retaining only $81.7 million.

The Buyer's stock price plummeted from the $8 per share valuation used in the de-SPAC transaction. By October 2023, the stock had fallen to under $0.60 per share. By April 2024, the stock had fallen below $0.05 per share.

Facing delisting because of its failure to meet Nasdaq's $1.00 minimum trading price requirement, the Buyer conducted a 1-for-80 reverse stock split on April 18, 2024. By December 2, 2024, the Buyer's stock had traded down to $0.83 per share, representing a 99.88% loss from the $8 valuation used in the de-SPAC transaction. Adjusting for the reverse stock split, the Buyer's stock was trading for pennies per share.

Even as the Buyer's stock price plummeted, the Investment Manager and the Directors failed to take any steps to diversify the Master Fund's position and protect against losses. The Investment Manager and the Directors also did not take any steps to pursue the Dissolution Plan, such as by distributing the Buyer's common stock up through the Feeder Funds to their investors. Had they done so, investors could have decided for themselves whether to sell.

To date, the Master Fund has yet to liquidate. The Investment Manager has no apparent plans to do so.

**H.      The Master Fund Keeps Paying The Annual Fee.**

After the Asset Sale, the scope of the Investment Manager's duties narrowed dramatically. Before the Asset Sale, the Investment Manager was overseeing a portfolio of approximately 125 alternative investment managers. The Investment Manager also had to consider the liquidity needs of Feeder Fund investors and manage periodic tender offers.

After the Asset Sale, the Master Fund held all of its AUM in a single, illiquid security. There were no alternative investment managers or tender offers to oversee.

Because the Advisor Agreement renewed annually, the Board could have taken steps to renegotiate the Investment Manager's fees. The Board opted not to renegotiate and allowed the Advisor Agreement to renew annually on the same terms.

**I.      This Litigation**

The Young Women's Christian Association of Rochester and Monroe County (the "YWCA") is a non-profit organization that provides essential services and policy advocacy to support women, children, and families. The YWCA has been a beneficial owner of units in the tax-exempt Institutional Feeder Fund since 2012.

The YWCA filed this lawsuit on December 6, 2024. The YWCA asserts seven claims on behalf of the Master Fund. All are double-derivative claims, meaning the YWCA is initially asserting its right to sue derivatively on behalf of the tax-exempt Institutional Feeder Fund. This decision therefore refers to that fund as the "Plaintiff

Feeder Fund." The claim that the YWCA seeks to cause the Plaintiff Feeder Fund to assert derivative is its right to sue derivatively on behalf of the Master Fund.[10]

On January 10, 2025, the defendants removed the suit to the United States District Court for the District of Delaware. The YWCA filed an amended complaint that eliminated the basis for federal jurisdiction. The district court remanded the case, and the parties agreed to use that pleading as the Complaint.

Count I asserts that the Directors breached their fiduciary duties by approving the Asset Sale, then failing to pursue the Dissolution Plan. Count I also asserts that the Directors breached their fiduciary duties by allowing the Advisor Agreement to renew without renegotiating the annual fee.

Count II asserts that the Investment Manager breached its fiduciary duties by engaging in the same conduct.

Count III asserts that the Investment Manager breached the Advisor Agreement by failing to provide and oversee an investment program after the Asset Sale.

Count IV asserts that Perkins and the Investment Manager were unjustly enriched by continuing to receive the same annual fee after the Asset Sale.

---

[10] Technically, the YWCA is asserting triple-derivative claims, because the Plaintiff Feeder Fund invests in the Master Fund through the offshore blocker entity. But the parties agree that the analysis and outcome would be the same because the blocker entity is simply a conduit for the Plaintiff Feeder Fund's investment in the Master Fund. Its governance structure otherwise parallels the Plaintiff Feeder Fund and the Master Fund, so the same demand futility principles also apply.

18

Count V asserts a claim for fraud against the Buyer and Heppner based on false and misleading information allegedly provided during the negotiation of the Asset Sale.

Count VI asserts that the Buyer and Heppner aided and abetted the Directors and Investment Manager in breaching their duties.

Count VII asserts that the Buyer and Heppner were unjustly enriched through the Asset Sale and the Avalon Transaction.

The defendants moved to dismiss all of the claims on a variety of grounds. All of the defendants moved to dismiss all of the counts under Rule 23.1. The Outside Directors moved to dismiss Count I under Rule 12(b)(6) as failing to state a claim on which relief can be granted. The Buyer and Heppner moved to dismiss Counts V, VI, and VII on the same basis.

On December 5, 2025, the court dismissed Count V for failing to state a claim on which relief can be granted. In an opinion issued on March 27, 2026, the court ruled on Rule 12(b)(6) motions filed by Outside Directors, the Buyer, and Heppner (the "Rule 12(b)(6) Decision"). The Rule 12(b)(6) Decision denied the Outside Directors' and the Buyer's motions, but granted Heppner's motion. This decision denies the Rule 23.1 motions.

## II.    LEGAL ANALYSIS

All of the defendants moved to dismiss the Complaint under Court of Chancery Rule 23.1. Titled "Pleading Requirements," Rule 23.1(a) states:

The complaint in a derivative action must:

19

(1) state with particularity:

(A) any effort by the derivative plaintiff to obtain the desired action from the entity; and

(B) the reasons for not obtaining the action or not making the effort; and

(2) allege facts supporting a reasonable inference that the derivative plaintiff has standing to sue derivatively under the law governing the entity.[11]

As a matter of procedure, Rule 23.1 imposes a pleading requirement on a plaintiff that seeks to assert a derivative claim so that demand doctrine and other standing principles can be applied at the pleading stage.[12] The obligation to establish demand futility or wrongful refusal are themselves standing doctrines,[13] but Rule 23.1

---

[11] Ch. Ct. R. 23.1(a).

[12] *United Food & Com. Workers Union v. Zuckerberg*, 250 A.3d 862, 876 (Del. Ch. 2020) [*Zuckerberg I*] ("The doctrines of demand refusal and demand excusal are substantive requirements of Delaware law. As a matter of procedure, Rule 23.1 imposes a pleading requirement on a plaintiff that seeks to assert a derivative claim so that the doctrines can be applied at the pleading stage."), *aff'd sub nom. United Food & Com. Workers Union & Participating Food Indus. Emps. Tri-State Pension Fund v. Zuckerberg*, 262 A.3d 1034 (Del. 2021) [*Zuckerberg II*].

[13] *See, e.g.*, *Sagarra Inversiones, S.L. v. Cementos Portland Valderrivas, S.A.*, 34 A.3d 1074, 1080 (Del. 2011) (holding that the internal affairs doctrine governs a party's "standing to sue derivatively, including its presuit demand obligations"); *Drachman v. Cukier*, 2021 WL 5045265, at *6 (Del. Ch. Oct. 29, 2021) (listing standing requirements that stockholders must meet to sue derivatively, including requirements to "show adequacy, contemporaneous and continuous stock ownership, and fulfill the demand requirement—either by pleading demand futility or wrongful refusal"); *In re El Paso Pipeline P'rs, L.P. Deriv. Litig.*, 132 A.3d 67, 128 (Del. Ch. 2015) (noting that the defendants invoked "derivative standing doctrines such as the continuous ownership requirement and the failure to make demand"), *rev'd on other grounds sub nom. El Paso Pipeline GP Co., L.L.C. v. Brinckerhoff*, 152 A.3d 1248 (Del. 2016); *Rich v. Yu Kwai Chong*, 66 A.3d 963, 975 n.104 (Del. Ch. 2013) (citing wrongful

addresses them separately to establish a heightened particularized pleading requirement for those issues. Rule 23.1 did not create the demand requirement; it is merely the "procedural embodiment of this substantive principle."[14]

The defendants raise two standing defenses under Rule 23.1. First, they argue that the Plaintiff Feeder Fund lacks the equity interest necessary to support a double-derivative claim. As they see it, an investor in a first-tier entity can only assert a double-derivative claim if the first-tier entity owns at least a majority of the equity in the second-tier entity. Because the Plaintiff Feeder Fund only owns a 48% limited partner interest in the Master Fund, the defendants say the YWCA cannot assert a double-derivative claim.

Second, the defendants say that the Complaint fails to plead demand futility because the Outside Directors constitute a supermajority of the Board and can properly consider a demand.

Neither argument warrants dismissal.

---

demand refusal as a basis for derivative standing); *see also CML V, LLC v. Bax*, 6 A.3d 238, 248 (Del. Ch. 2010) ("Given the close connection between Sections 1001 and 1002 and the obvious intent to transplant the demand and contemporaneous ownership requirements into the LP corpus, one could readily imagine that the NCCUSL scribes did not consciously intend to change the rules of derivative standing."), *aff'd,* 28 A.3d 1037 (Del. 2011). A Rule 23.1 dismissal thus only addresses the named plaintiff's standing; it is not a judgment on the merits.

[14] *Rales v. Blasband*, 634 A.2d 927, 932 (Del. 1993), *overruled in part on other grounds by Zuckerberg II*, 262 A.3d 1034; *accord Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 96–97 (1991) (holding that the demand requirement underlying Rule 23.1 is substantive, while the Rule 23.1 pleading requirement is procedural).

## A. The Double Derivative Ownership Requirement

The defendants first argue that because the Plaintiff Feeder Fund only holds a 48% interest in the Master Fund, the YWCA cannot assert double-derivative claims. That is not so. There are two ways to plead double-derivative standing: the Double-Futility Test and the Demand-Plus-Control Test. Neither imposes a threshold requirement of majority ownership.

### 1. The Double-Futility Test

For a Delaware limited partnership, the Delaware Limited Partnership Act (the "LP Act") codifies the concept of a derivative action:

> A limited partner or an assignee of a partnership interest may bring an action in the Court of Chancery in the right of a limited partnership to recover a judgment in its favor if general partners with authority to do so have refused to bring the action or if an effort to cause those general partners to bring the action is not likely to succeed.[15]

The limited partner's derivative action is a statutory descendant of the corporate derivative action. "Devised as a suit in equity, the purpose of the derivative action was . . . to protect the interests of the corporation from the misfeasance and malfeasance of 'faithless directors and managers.'"[16]

A derivative action is two suits in one. Chancellor Josiah O. Wolcott, one of Delaware's greatest jurists, wrote in 1932 that

---

[15] 6 *Del. C.* § 17-1001.

[16] *Kamen*, 500 U.S. at 95 (quoting *Cohen v. Beneficial Loan Corp.*, 337 U.S. 541, 548 (1949)).

[t]he complainants' case, being asserted by them in their derivative right as stockholders, has a double aspect. Its nature is dual. It asserts as the principal cause of action a claim belonging to the corporation to have an accounting from the defendants and a decree against them for payment to the corporation of the sum found due on such accounting. In this aspect, the cause of action is the corporation's. It does not belong to the complainants. Inasmuch however as the corporation will not sue because of the domination over it by the alleged wrongdoers who are its directors, the complainants as stockholders have a right in equity to compel the assertion of the corporation's rights to redress. This is their individual right. A bill filed by stockholders in their derivative right therefore has two phases—one is the equivalent of a suit to compel the corporation to sue, and the other is the suit by the corporation, asserted by the stockholders in its behalf, against those liable to it. The former belongs to the complaining stockholders; the latter to the corporation.[17]

In *Aronson v. Lewis*, the Delaware Supreme Court embraced the two-suits-in-one concept: "The nature of the [derivative] action is two-fold. First, it is the equivalent of a suit by the shareholders to compel the corporation to sue. Second, it is a suit by the corporation, asserted by the shareholders on its behalf, against those liable to

---

[17] *Cantor v. Sachs*, 162 A. 73, 76 (Del. Ch. 1932) (citations omitted); *accord Harff v. Kerkorian*, 324 A.2d 215, 218 (Del. Ch. 1974), *aff'd in part, rev'd in part on other grounds*, 347 A.2d 133 (Del. 1975).

it."[18] Subsequent Delaware Supreme Court decisions have reaffirmed the two-fold nature of the derivative suit.[19]

As Chancellor Wolcott explained, the metaphorical two suits in one have different purposes. The first suit is about whether the stockholder is entitled to sue

---

[18] 473 A.2d 805, 811 (Del. 1984). In *Brehm v. Eisner*, 746 A.2d 244, 253–54 (Del. 2000), the Delaware Supreme Court overruled seven precedents, including *Aronson*, to the extent those precedents reviewed a Rule 23.1 decision by the Court of Chancery under an abuse of discretion standard or otherwise suggested deferential appellate review. *See id.* at 253 n.13 (overruling in part on this issue *Scattered Corp. v. Chi. Stock Exch.*, 701 A.2d 70, 72–73 (Del. 1997); *Grimes v. Donald*, 673 A.2d 1207, 1217 n.15 (Del. 1996); *Heineman v. Datapoint Corp.*, 611 A.2d 950, 952 (Del. 1992); *Levine v. Smith*, 591 A.2d 194, 207 (Del. 1991); *Grobow v. Perot*, 539 A.2d 180, 186 (Del. 1988); *Pogostin v. Rice*, 480 A.2d 619, 624-25 (Del. 1984); and *Aronson*, 473 A.2d at 814). The *Brehm* Court held that going forward, appellate review of a Rule 23.1 determination would be *de novo* and plenary. *Brehm*, 746 A.2d at 254. The seven partially overruled precedents otherwise remain good law. In this decision, I do not rely on any of them for the standard of appellate review. Although the technical rules of legal citation would require noting that each was reversed on other grounds by *Brehm*, I have chosen to omit the cumbersome subsequent history, which creates the misimpression that *Brehm* rejected core elements of the Delaware derivative action canon.

[19] *See Schoon v. Smith*, 953 A.2d 196, 201–02 (Del. 2008) (tracing history of derivative action and explaining its dual nature); *Spiegel v. Buntrock*, 571 A.2d 767, 773 (Del. 1990) (quoting *Aronson* for the "two-fold" nature of the derivative action); *Sternberg v. O'Neil*, 550 A.2d 1105, 1124 n.41 (Del. 1988) ("The normal derivative suit was 'two suits in one: (1) The plaintiff brought a suit in equity against the corporation seeking an order against it; (2) to bring a suit for damages or other legal injury for damages or other relief against some third person who had caused legal injury to the corporation.'" (quoting Robert C. Clark, *Corporate Law* § 15.1, at 639–40 (1986))); *Kaplan v. Peat, Marwick, Mitchell & Co.*, 540 A.2d 726, 730 (Del. 1988) (quoting *Aronson* in describing the "two-fold" nature of the derivative action); *Zapata Corp. v. Maldonado*, 430 A.2d 779, 784 (Del. 1981) (citing "the 'two phases' of a derivative suit, the stockholder's suit to compel the corporation to sue and the corporation's suit").

on the corporation's behalf (the "Entitlement Claim"). The second claim is the corporation's cause of action on the merits (the "Merits Claim").[20]

The double-derivative action follows logically from the two-suits-in-one structure. In a double-derivative action, a first-tier corporation owns equity in a second-tier corporation, and a stockholder in the first-tier corporation seeks to assert a Merits Claim belonging to the second-tier corporation. That legal construct is possible because a stockholder can seek to assert derivatively any claim belonging to a corporation in which the stockholder owns shares—as long as the stockholder can establish an Entitlement Claim. In a double-derivative action, the first-tier stockholder holds an Entitlement Claim to sue derivatively on behalf of the first-tier corporation. The first-tier corporation, as a stockholder in the second-tier corporation, in turn holds its own Entitlement Claim to sue derivatively on behalf of the second-tier corporation. The second-corporation in turn holds the Merits Claim. The resulting suit combines three claims in one: an Entitlement Claim relating to the

---

[20] Professor Ballantine called the Entitlement Claim the "propulsive claim," because it provides the mechanism by which the stockholder propels the corporation's claim forward. Henry Winthrop Ballantine, *Ballantine on Corporations* § 145, at 344 (1946) ("The proceeding may be regarded as a 'propulsive' one, to compel in one proceeding the enforcement of the obligation owed by the corporation to the plaintiff and to all its shareholders, to assert its right of action for their benefit."); *see Weingand v. Atl. Sav. & Loan Assn.*, 464 P.2d 106, 112 (Cal. 1970) (citing "propulsive" terminology); *Gagnon Co. v. Nev. Desert Inn*, 289 P.2d 466, 470 (Cal. 1955) (same).

25

first-tier corporation, an Entitlement Claim relating to the second-tier corporation, and the second-tier corporation's Merits Claim.

In a double-derivative claim, a stockholder gains the ability to sue on behalf of the first-tier corporation by showing that demand is excused at the first-tier level, thereby proving its Entitlement Claim.[21] If the stockholder succeeds on the Entitlement Claim at the first-tier level, then the stockholder can assert the first-tier corporation's Entitlement Claim to sue derivatively on behalf of the second-tier corporation. The stockholder achieves the power to sue on behalf of the second-tier subsidiary by showing that demand is futile at the second-tier level, thereby proving its Entitlement Claim. If both Entitlement Claims succeed, then the first-tier stockholder can assert the second-tier corporation's Merits Claim. Because this method of establishing standing requires demand to be futile at both the first-tier and second-tier levels, let's call it the Double-Futility Test.[22]

*Rales* illustrates the Double-Futility Test. A stockholder of Danaher Corporation sought to assert a derivative claim on behalf of Easco Hand Tools, Inc. ("Easco"), a wholly owned subsidiary of Danaher.[23] The Delaware Supreme Court

---

[21] The stockholder could also show wrongful refusal. To avoid cumbersome repetition, the discussion focuses on demand futility.

[22] The same logic would apply to subsidiaries lower in the chain if the stockholder wanted to assert a claim belonging to a lower-tier subsidiary. The Double-Futility Test thus could become the Triple-Futility Test or the Quadruple-Futility Test.

[23] *Rales*, 634 A.2d at 930.

applied the demand futility test to the directors on the Danaher board and found demand futile.[24] The justices noted that three members of the Danaher board who were also members of the Easco board had "a disqualifying financial interest that disable[d] them from impartially considering a response to a demand."[25] The justices concluded that the derivative action could proceed, implicitly finding that demand was futile for the Easco board as well, albeit without conducting a separate subsidiary-level analysis.[26]

In this decision's parlance, the Delaware Supreme Court first held that the Danaher stockholder had adequately pled an Entitlement Claim against the Danaher board. Having done so, the Danaher stockholder could assert Danaher's Entitlement Claim against the Easco board. The Delaware Supreme Court then held that because of the overlapping directors, the Danaher stockholder had also adequately pled Danaher's Entitlement Claim against the Easco board. The Danaher stockholder therefore gained standing to assert Easco's Merits Claim.

Under longstanding doctrine, the gating item for double-derivative standing is not a particular level of first-tier or second-tier equity ownership, but rather a

---

[24] *Id.* at 935–37.

[25] *Id.* at 936.

[26] *Id.* at 937.

showing of demand futility at both levels.[27] At that point, there is no independent and disinterested board at either level that can decide what to do with the claim, so the first-tier stockholder can proceed. Under the Delaware General Corporation Law, one share is sufficient to sue derivatively.[28] That is true at the first-tier level. It is equally true at the second-tier level.

The LP Act's codification of the limited partner derivative action supports the same double-derivative path. By statute, "[a] limited partner . . . may bring an action . . . in the right of a limited partnership . . . if general partners with authority to do

---

[27] *See Holmes v. Camp*, 167 N.Y.S. 840, 842–43 (App. Div. 1917) (addressing double-derivative action as question of first impression); Garrard Glenn, *The Stockholder's Suit—Corporate and Individual Grievances*, 33 Yale L.J. 580, 588 (1924) (observing that stockholders of a holding company may sue for the benefit and on behalf of a subsidiary if "the directors of both companies having refused, after due request, to institute an action in the name of either company" (citing *Holmes*, 167 N.Y.S. at 841)); *see generally* Annotation, *Right of Stockholder of One Corporation to Maintain Derivative Action in Right of Another Corporation ("Double Derivative Suit")*, 154 A.L.R. 1295 (1945) ("[T]he great weight of authority recognizes the right of such stockholder to maintain such a suit on behalf of such corporation, where neither the stockowning corporation nor the corporation whose stock is held is willing to enforce the right . . . ." (collecting cases)); *Suits by a Shareholder in a Parent Corporation to Redress Injuries to the Subsidiary*, 64 Harv. L. Rev. 1313, 1313 (1951) ("The injury to the subsidiary creates in its favor a cause of action which any of its shareholders, including the parent corporation, may enforce in the familiar shareholder's derivative suit.").

[28] *Orloff v. Shulman*, 2005 WL 3272355, at *11 n.70 (Del. Ch. Nov. 23, 2005) ("A shareholder who formally maintains continuous ownership generally has standing to bring a derivative claim, no matter how few shares he or she holds."); *accord Quadrant Structured Prods. Co., Ltd. v. Vertin*, 115 A.3d 535, 553 (Del. Ch. 2015) (explaining that "[o]ne share is enough" to maintain a derivative suit provided other standing requirements are met).

28

so have refused to bring the action . . . ."[29] In other words, a limited partner can bring an Entitlement Claim at the level of a first-tier limited partnership. If demand is futile, then the limited partner can assert any claim that limited partnership has, including that limited partnership's Entitlement Claim to sue derivatively on behalf of a second-tier limited partnership. If that Entitlement Claim succeeds, then the limited partner can assert the second-tier limited partnership's Merits Claim. Nowhere in this structure is there any type of minimum ownership requirement. The LP Act says simply that a "limited partner" may sue derivatively.[30]

## 2.  The Demand-Plus-Control Test

The Double-Futility Test is not the only means by which a first-tier stockholder can establish the ability to sue on behalf of a second-tier entity. In *Lambrecht*, the Delaware Supreme Court reasoned that when a claim belongs to a wholly owned subsidiary, the first-tier corporation exercises control over the second-tier corporation and can compel the second-tier corporation to sue.[31] In that setting, the justices held that the double-derivative claim "[n]ormally . . . is one that only the parent corporation, acting through its board of directors, is empowered to enforce." [32] Therefore, the first-tier stockholder need only establish demand futility at the first-

---

[29] 6 *Del. C.* § 17-1001.

[30] *Id.*

[31] *Lambrecht v. O'Neal*, 3 A.3d 277, 282–83 (Del. 2010).

[32] *Id.* at 282.

29

tier level.[33] The stockholder need not separately address demand futility at the second-tier level because for a wholly owned subsidiary, the first-tier corporation "is not required to proceed derivatively; it may enforce the claim by direct exercise of its 100 percent control."[34] Because this method of establishing double-derivative standing requires (1) demand to be futile at the first-tier level and (2) the first-tier corporation to exercise control over the second-tier corporation, let's call it the Demand-Plus-Control Test.

---

[33] *Id.* at 288 (explaining that "there is no basis in law or logic" to require a separate demand futility analysis at the subsidiary level and that to do so would treat the parent corporation "as if it were a minority shareholder" that could only proceed by establishing demand futility, when in reality the parent corporation simply directs its subsidiary to sue); *id.* at 289 (holding that standing and demand futility are based on the parent's "failure to prosecute the [subsidiary's] pre-merger claim, which [the parent] now (indirectly) owns."); *id.* at 289 n.40 (explaining that to proceed, "the plaintiffs must show that a demand on [the parent's] board would be futile, i.e., that [the parent's] board is incapable of making an impartial business judgment as to whether or not to enforce [the subsidiary's] pre-merger claim"); *see also id.* at 282 ("Cases may arise, however, where *the parent corporation's board* is shown to be incapable of making an impartial business judgment regarding whether to assert the subsidiary's claim. In those cases a shareholder of the parent will be permitted to enforce that claim on the parent corporation's behalf, that is, double derivatively." (emphasis added)).

[34] *Id.* at 288; *see id.* at 289 ("[The parent's] sole ownership, alone and without more, empowers and entitles [it], acting through its own board of directors or authorized officers, to use its direct control to cause its wholly owned subsidiary . . . to do what is necessary to enforce [the subsidiary's] pre-merger claim."); *see also id.* at 289 n.40 (positing that "[the subsidiary's] corporate separateness would not be diminished by an action taken by its sole owner directing [the subsidiary's] managers to file a lawsuit"); *id.* at 290 (finding no risk of abuse from allowing the double-derivative claim to proceed based solely on demand futility at the parent level because "the double derivative suit cannot go forward except in the unusual case where the parent company board is shown to be incapable of deciding impartially whether or not to enforce the claim that the parent company now (indirectly) owns").

*Lambrecht* addressed a wholly owned subsidiary, where the Demand-Plus-Control Test was easy to apply. But other means of control exist. A first-tier corporation that controls a majority of a second-tier corporation's stockholder-level voting power controls the second-tier corporation.[35] So does a first-tier corporation that can elect, appoint, or designate directors who can exercise a majority of a second-tier corporation's board-level voting power.[36] By statute, so does a first-tier corporation that (1) owns or controls at least one-third of a second-tier corporation's stockholder-level voting power, (2) has power functionally equivalent to that of a stockholder that controls a majority of the stockholder-level voting power in the second-tier corporation, and (3) has the power to exercise managerial authority over the business and affairs of the second-tier corporation.[37] At common law, authorities recognized that a first-tier corporation could exercise control over a second-tier corporation in a variety of other ways.[38]

---

[35] 8 *Del. C.* § 144(e)(2)a.

[36] 8 *Del. C.* § 144(e)(2)b.

[37] 8 *Del. C.* § 144(e)(2)c.

[38] *See* J. Travis Laster, *How to Evaluate Majority Control: What History and Statutes Tell Us—Part One: The Historical Dominance of Functionalism,* 31 Fordham J. Corp. & Fin. L. 1 (2025).

To date, decisions have applied the Demand-Plus Control Test where a first-tier entity controlled at least a majority of the second-tier entity's voting power.[39] But nothing about the doctrine suggests that majority voting power—rather than control—is the critical issue.

---

[39] *See e.g.*, *Bamford v. Penfold, L.P.*, 2020 WL 967942, at \*26 (Del. Ch. Feb. 28, 2020) (citing *Lambrecht*, 3 A.3d at 283) (evaluating demand futility where the parent limited partnership held a 90% interest in the subsidiary LLC); *see also Belendiuk v. Carrión*, 2014 WL 3589500, at \*7 (Del. Ch. July 22, 2014) (assuming, for the sake of analysis, Delaware law permitted double-derivative claims on behalf of non-wholly owned subsidiaries and evaluating demand futility where the parent owned 55% of the subsidiary at the time of the demand). Courts outside of Delaware have generally permitted double-derivative actions where the parent controls at least a majority of the subsidiary's voting power. *See e.g.*, *Obeid v. La Mack*, 2018 WL 2059653, at \*16–17 (S.D.N.Y. May 1, 2018) (recognizing the right to bring double-derivative suits on behalf of a "majority controlled" subsidiary but dismissing for failure to plead adequate supporting facts); *White v. Hyde*, 2016 WL 5853138, at \*6 (N.C. Super. Ct. Oct. 4, 2016) (permitting double-derivative suit where parent owned 75% of the subsidiary); *Carlin v. Brownfield*, 1985 WL 10327, at \*3 (Oh. Ct. App. June 18, 1985) (explicitly recognizing right of corporate shareholder to bring double-derivative action on behalf of corporation's 98%-owned subsidiary); *Issner v. Aldrich*, 254 F. Supp. 696, 700, 702 (D. Del. 1966) (implicitly recognizing the right of a shareholder of a Virginia corporation to bring a double-derivative action on behalf of a 50% owned subsidiary, but dismissing action for failure to show that demand was excused); *Kaufman v. Wolfson*, 151 N.Y.S.2d 530, 532 (App. Div. 1956) ("Suit by the stockholder of a parent corporation need not be limited only to situations in which the subsidiary is wholly owned or in which there is no one else who can sue."); *see also Brown v. Tenney*, 532 N.E.2d 230, 235–36 (Ill. 1988) (holding "a double derivative action may be maintained by a shareholder of record in a holding company, on behalf of a subsidiary controlled or dominated by the holding company . . . ."). At least one court has refused to permit a parent company stockholder to assert a double-derivative claim where the parent controlled less than a majority of the subsidiary's voting power. *See DiMare v. DiMare*, 2021 WL 3493553, at \*4 (Mass. Super. Apr. 28, 2021) (dismissed for lack of standing because parent owned one third of subsidiary and therefore did not have majority control of the subsidiary).

Nevertheless, the defendants argue that a first-tier equity investor can only assert a double-derivative claim if the first-tier entity owns a majority of the equity in the second-tier entity. They point out that the YMCA is a limited partner in the Plaintiff Feeder Fund, which only owns a 48% limited partner interest in the Master Fund. They conclude that the YWCA therefore cannot assert a double-derivative claim. That argument is trebly wrong.

First, the Demand-Plus-Control Test is an alternative to the Double-Futility Test. The Demand-Plus-Control Test does not override the Double-Futility Test.[40] The YWCA can proceed under the Double-Futility Test regardless of the content of the Demand-Plus-Control Test.

Second, the Demand-Plus-Control Test does not turn on majority ownership. It turns on control, and the concept of control based on majority ownership maps poorly onto the limited partnership context. The LP Act vests control over a limited partnership in its general partners.[41] Limited partners generally cannot exercise

---

[40] *See Belendiuk*, 2014 WL 3589500, at \*7 ("Although recent decisions . . . have clarified that a stockholder seeking to maintain a double derivative action on behalf of a *wholly owned* subsidiary need only show that demand is excused at the parent level, those decisions did not alter the requirement that—to the extent Delaware law allows a stockholder of a parent company to pursue a double derivative action on behalf of a *non-wholly owned* subsidiary—the stockholder must show demand futility at the parent level and the subsidiary level.").

[41] 6 *Del. C.* § 17-403 ("[A] general partner . . . has the rights and powers . . . of a partner in a partnership . . . that is governed by the [Revised Uniform Partnership Act]"); *see* 6 *Del. C.* § 15-401(f) ("Each partner has equal rights in the management and conduct of the partnership business and affairs."); *Boardwalk Pipeline P'rs, LP v. Bandera Master Fund LP*, 288 A.3d 1083, 1109 (Del. 2022) (noting that in a limited

control, even though they "may have a large or even a majority ownership interest in the limited partnership."[42] In fact, if a limited partner actively participates in managing a limited partnership, the limited partner can lose its limited liability shield and potentially take on the fiduciary duties associated with "participat[ing] in the control of the business."[43] A general partner presumptively controls the limited partnership, regardless of the size of its equity interest. The Plaintiff Feeder Fund could own a 99.99% limited partner interest in the Master Fund and it would not have control.

Third, the Demand-Plus-Control Test does not depend on majority *ownership*. Majority control as a form of hard control rests on majority *voting power*, which can diverge from majority ownership.[44]

The defendants go so far as to assert that investors in the Plaintiff Feeder Fund would need to form a coalition with investors from other Feeder Funds to exceed the 50% threshold.[45] That merely shows how untethered their logic is to any sense of how

partnership with a singular general partner, there is a "severe consolidation of governing power in the general partner").

[42] *Lewis v. AimCo Props., L.P.*, 2015 WL 557995, at *6 (Del. Ch. Feb. 10, 2015).

[43] *See* 6 *Del. C.* § 17-303(a); *Beal Bank, SSB v. Lucks*, 2001 WL 220252, at *7 (Del. Ch. Feb. 20, 2001).

[44] *See* 6 *Del. C.* § 144(e)(2).

[45] *See* Transcript of December 5, 2025 Oral Argument ("Tr.") at 16, Dkt. 72 (defense counsel claiming that the proper mechanism for bringing a double-derivative

the master-feeder structure operates. Even if all of the investors in all of the Feeder Funds joined in the claim, they would still only be limited partners. The Investment Manager would still control each of the Feeder Funds and the Master Fund as their general partner, subject to the managerial authority delegated to the Directors. The effort would not achieve anything for purposes of the Demand-Plus-Control Test.

Here, standing to sue turns on the Double-Futility Test, not any particular level of equity ownership at either the first-tier or second-tier level.

## B. The Erroneous Preclusion And Due Process Arguments

The defendants make two other arguments against the YWCA's ability to assert double-derivative claims: one based on preclusion, another based on due process. Neither moves the needle.

First, the defendants argue in conclusory fashion that a final judgment in this action would not bind investors in any Feeder Fund other than the Plaintiff Feeder Fund. They contend that allowing the YWCA to proceed would be unfair because it could result in three more lawsuits, one brought on behalf of each of the other Feeder Funds. That is not how preclusion in derivative actions works.

Once a plaintiff secures the ability to assert a Merits Claim on behalf of an entity, any final judgment binds that entity. No other investor can assert the claim

---

in this case would be to have "a majority interest bring the claim double-derivatively on behalf of the subsidiary").

on that entity's behalf, because that entity is bound.[46] If multiple stockholders in different jurisdictions successfully assert an Entitlement Claim to bring the same Merits Claim on behalf of the same corporation, the first final judgment on the merits forecloses the other actions under principles of claim preclusion.[47] The same is true for a double-derivative claim. If different investors successfully assert Entitlement Claims to sue on behalf of different first-tier entities but the same second-tier entity, the first final judgment binds the second-tier entity. Through the second-tier entity, that judgment on the merits forecloses the other actions under principles of claim preclusion.

Because demand is futile at both the first-tier and second-tier levels, the YWCA is entitled to assert the Master Fund's Merits Claims. If this case proceeds to judgment, then that judgment will bind the Master Fund. The fact that the YWCA is proceeding through the Plaintiff Feeder Fund does not matter.

The defendants argue that outcome could offend due process because the different Feeder Funds are supposedly differently situated. In making this argument,

---

[46] *La. Mun. Police Employees' Ret. Sys. v. Pyott*, 46 A.3d 313, 331–32 (Del. Ch. 2012), *rev'd on other grounds,* 74 A.3d 612 (Del. 2013); *Kohls v. Kenetech Corp.*, 791 A.2d 763, 770 (Del. Ch. 2000), *aff'd*, 794 A.2d 1160 (Del. 2002) (ORDER).

[47] *See In re Wal-Mart Stores, Inc. Del. Deriv. Litig.*, 167 A.3d 513, 524–25 (Del. Ch. 2017) (subsequent history omitted); *see also EZCORP*, 130 A.3d at 945–46 (comparing preclusive effect of judgment on the merits with non-preclusive effect of dismissal based on lack of standing); *but see Cal. State Tchrs.' Ret. Sys. v. Alvarez*, 179 A.3d 824, 832 (Del. 2018) (predicting that Arkansas Supreme Court would give preclusive effect to non-merits-based dismissal of derivative action on standing grounds for failure to plead demand futility).

the defendants preemptively dispute a requirement for nonparty preclusion, namely that the nonparty be adequately represented by someone with the same interests who was a party to the suit.[48]

For purposes of asserting the claims in this case, the Feeder Funds are identically situated. Each invests all of its assets in the Master Fund. Each participates pro rata in the gains or losses sustained by the Master Fund. Any recovery will go presumptively to the Master Fund and indirectly benefit the Feeder Funds in accordance with their proportionate ownership in the Master Fund. All of the Feeder Funds and all of their investors have the same interest in the case. There is no adequacy issue based on parties being differently situated.[49]

There is no basis to deny the YWCA the ability to assert a double-derivative claim on behalf of the Master Fund based on the magnitude of the Plaintiff Feeder Fund's limited partner interest in the Master Fund. If the YWCA can meet the Double-Futility Test, then the YWCA can assert Merits Claims on the Master Fund's behalf.

---

[48] *See Taylor v. Sturgell*, 553 U.S. 880, 893–95 (2008); *Richards v. Jefferson Cty.*, 517 U.S. 793, 798 (1996).

[49] The defendants allude to differences in tax treatment, but those differences are built into the master-feeder structure and apply at the Feeder Fund or investor level. Any recovery the Master Fund obtains in this action will eventually be distributed up through the Feeder Funds to their investors, just like any gains the Master Fund could have made on its investments or any other assets in dissolution. Every investor in each Feeder Fund has the same interest in maximizing the Master Fund's recovery. There is no misalignment of interests.

## C. Pleading Double-Demand Futility

Under the Double-Futility Test, the YWCA must plead that demand would have been futile at both the Plaintiff Feeder Fund and Master Fund levels. Given the rulings in the Rule 12(b)(6) Decision, the Complaint clears that hurdle.

By its very nature, asserting a derivative action encroaches on the managerial freedom of directors. In order for an investor to assert a derivative claim, the investor must either (i) obtain express permission, (ii) receive implicit permission to proceed as a result of the board taking no position on the litigation, (iii) ask the board for permission and show that the board wrongfully refused to pursue the action or permit the stockholder to proceed, or (iv) show that it would have been futile to ask the board for permission because the board lacked a disinterested and independent majority that could consider a demand to sue. The YWCA did not obtain express or implicit permission and did not make a demand. The YWCA must therefore show that it would have been futile to ask the Board for permission to sue.

Court of Chancery Rule 23.1 calls for the complaint in a derivative action to allege particularized facts sufficient to establish demand futility.[50] By taking this approach, Rule 23.1 ensures that "demand principles can be applied at the outset of a case."[51]

---

[50] *In re Fox Corp. Deriv. Litig.*, 2024 WL 5233229, at *7 (Del. Ch. Dec. 27, 2024)

[51] *Ont. Provincial Council of Carpenters' Pension Tr. Fund v. Walton*, 2023 WL 3093500, at *29 (Del. Ch. Apr. 26, 2023).

Whether demand is excused turns on whether the Complaint's allegations give rise to reason to doubt that the Directors could have properly responded to a demand. The reason-to-doubt standard is intended to be "sufficiently flexible and workable to provide the stockholder with 'the keys to the courthouse' in an appropriate case where the claim is not based on mere suspicions or stated solely in conclusory terms."[52] The standard is not intended to incorporate the reasonable-doubt concept "normally present in criminal prosecution."[53] "Reasonable doubt can be said to mean that there is a reason to doubt."[54] "Stated obversely, the concept of reasonable doubt is akin to the concept that the stockholder has a 'reasonable belief' that the board lacks independence or that the transaction was not protected by the business judgment rule. The concept of reasonable belief is an objective test . . . ."[55]

Under Rule 23.1, a plaintiff must plead particularized facts sufficient to give rise to a reasonable doubt, but that does not mean that a plaintiff must "plead particularized facts sufficient to sustain 'a judicial finding'" that a director would be disabled from considering a demand.[56] That requirement would impose "an excessive

---

[52] *Grimes*, 673 A.2d at 1217 (footnote omitted).

[53] *Id.*

[54] *Id.*

[55] *Id.* at 1217 n.17.

[56] *Grobow*, 539 A.2d at 183.

criterion" for applying Rule 23.1.[57] The operative standard is the reasonable doubt test.

### 1. The Erroneous Pleading Standard

As a threshold matter, the defendants argue that the court should take a harder look at the Complaint because the YWCA failed to seek books and records under Section 220 of the DGCL.[58] For that proposition, they rely on the Court of Chancery's decision in *White v. Panic*.[59] But the Delaware Supreme Court rejected that argument on appeal.[60]

---

[57] *Id.*

[58] 8 *Del. C.* § 220.

[59] *White v. Panic*, 793 A.2d 356, 371–72 (Del. Ch. 2000) [*White I*], *aff'd* 783 A.2d 543 (Del. 2001) [*White II*].

[60] *White II*, 783 A.2d 543, 549–50 (Del. 2001). The defendants failed to cite *White II*. A lawyer has the obligation to disclose legal authority in the controlling jurisdiction that is "directly adverse to the position of the client . . ." Del. Rules of Pro. Conduct R. 3.3(a)(2) (providing that a lawyer shall not knowingly "fail to disclose to the tribunal legal authority in the controlling jurisdiction known to the lawyer to be directly adverse to the position of the client and not disclosed by opposing counsel").

The failure to cite adverse authority is becoming a problem. Just five years ago, the Delaware Supreme Court went out of its way "remind the bar of counsel's obligation to cite adverse authority." *Williams v. Toll Bros. Builders*, 257 A.3d 1022, 2021 WL 3200825, at *3 (Del. 2021) (ORDER). After quoting Rule 3.3(a)(2), the Delaware Supreme Court also quoted Comment 4, which states:

> Legal argument based on a knowingly false representation of law constitutes dishonesty toward the tribunal. A lawyer is not required to make a disinterested exposition of the law, but must recognize the existence of pertinent legal authorities. Furthermore, as stated in paragraph (a)(2), an advocate has a duty to disclose

40

In *White I*, the Court of Chancery declined to "give a broad reading to the facts alleged in the complaint" or "infer from them the existence of other facts that would have been proved or disproved by a further presuit investigation."[61] The trial court read the complaint narrowly because the plaintiff had not used Section 220. In *White II*, the justices affirmed the dismissal but rejected the tightened pleading standard. The high court stated: "[A] perceived deficiency in [a] plaintiff's pre-suit investigation would not permit the Court of Chancery . . . to limit its reading of the complaint or to deny the plaintiff the benefit of reasonable inferences from well-pleaded factual allegations."[62]

The defendants are therefore wrong to argue that a stockholder must meet a higher pleading standard when it did not use Section 220. In the decision on appeal from the decision they cite, the justices rejected that argument.

---

directly adverse authority in the controlling jurisdiction that has not been disclosed by the opposing party.

"Under Rule 3.3, an attorney should not ignore potentially dispositive authorities; rather, counsel must cite adverse cases which are ostensibly controlling and then may argue their merits or inapplicability." *Williams*, 2021 WL 3200825, at *3 (cleaned up). Even if counsel believe the authorities should be rejected or reconsidered, "counsel have an affirmative obligation to advise the court of adverse authorities, though they are free to urge their reconsideration." *Id.* (cleaned up); *accord In re VBR Agency, LLC*, 274 A.3d 1068, 1076 (Del. Ch. 2022).

The opinion in *White II* is not just adverse legal authority in the controlling jurisdiction, it is *controlling* adverse authority in the controlling jurisdiction.

[61] *White I*, 793 A.2d at 364.

[62] *White II*, 783 A.2d at 549–50.

The defendants are all the more wrong to fault the YWCA for not using Section 220 because the Plaintiff Feeder Fund and the Master Fund are not corporations. Section 220 therefore does not apply. The LP Act contains its own books and records provision,[63] but the defendants have not explained how that section would enable the YWCA to access the books and records of the Master Fund. Nothing in the LP Act provision explicitly gives a limited partner access to information beyond the partnership in which the limited partner holds an interest, in contrast to Section 220. The LP Act's section also allows the general partners or the partnership agreement to establish "reasonable standards" for access,[64] and permits the general partner to withhold documents reasonably believed to be competitively sensitive or protected by nondisclosure requirements.[65] It is far from clear that the YWCA could have obtained anything from the Master Fund under the LP Act.

A partnership agreement can give a limited partner greater informational rights, but nothing in the LP Agreement does so.[66] The prospectus for the Plaintiff Feeder Fund indicates that investors have virtually no ability to obtain documents at

---

[63] 6 *Del. C.* § 17-305. The defendants cite to this provision in a footnote but do not deal with its scope or implications. *See* Opening Brief of David B. Perkins and Hatteras Investment Partners, LP at 35 n.19. Dkt. 28.

[64] *Id.* § 17-305(a).

[65] *Id.* § 17-305(b).

[66] *See* LPA § 8.10(a).

42

the Master Fund level, telling them in substance that they will only receive the Master Fund's annual and semi-annual reports.

The YWCA had no meaningful way to access the basic documents governing the actions it seeks to challenge. The YWCA cannot plead more than it has because it does not have access to more information.

## 2. A Substantial Risk Of Liability Under The Correct Pleading Standard

A limited partner may bring a derivative suit on the limited partnership's behalf "if general partners with authority to do so have refused to bring the action or if an effort to cause those general partners to bring the action is not likely to succeed."[67] A complaint asserting such claims "must set forth with particularity the effort, if any, of the plaintiff to secure initiation of the action by a general partner or the reasons for not making the effort."[68]

When the limited partner alleges demand is futile, generally "the conflict analysis . . . focuses on the general partner as an entity, not the individual members of the decision-making apparatus."[69] But the analysis can shift to individual decision-makers if "the limited partnership has agreed to include features of a corporation's

---

[67] 6 *Del C.* § 17-1001.

[68] 6 *Del. C.* § 17-1003; *accord* Ct. Ch. R. 23.1(a).

[69] *Wenske v. Blue Bell Creameries, Inc.*, 214 A.3d 958, 965 (Del. Ch. 2019).

governance structure that would mandate a different approach."[70] Where, as here, the limited partnership has a board of directors, the court may assess conflicts at the board level when considering whether demand is excused.[71] When analyzing compliance with demand doctrine in that setting, the test is the same as the test for a corporate board of directors.[72]

The resulting analysis generally proceeds on a claim-by-claim and director-by-director basis.[73] As to each claim, the court asks for each director,

> (i) whether the director received a material personal benefit from the alleged misconduct that is the subject of the litigation demand;
>
> (ii) whether the director faces a substantial likelihood of liability on any of the claims that would be the subject of the litigation demand; and
>
> (iii) whether the director lacks independence from someone who received a material personal benefit from the alleged misconduct that would be the subject of the litigation demand or who would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand.[74]

---

[70] *Id.*

[71] *See id.* (citing as an example *DiRienzo v. Lichtenstein*, 2013 WL 5503034, at *18 (Del. Ch. Sept. 30, 2013), where the general partner's board held managerial authority and the court assessed the directors' conflicts directly).

[72] *Ishimaru v. Fung*, 2005 WL 2899680, at *12 (Del. Ch. Oct. 26, 2005) (quoting *Litman v. Prudential-Bache Props., Inc.*, 1993 WL 5922, at *3 (Del. Ch. Jan. 4, 1993)).

[73] *Beam v. Stewart*, 833 A.2d 961, 977 n.48 (Del. Ch. 2003) ("Demand futility analysis is conducted on a claim-by-claim basis"), *aff'd*, 845 A.2d 1040 (Del. 2004).

[74] *Zuckerberg II*, 262 A.3d at 1059.

44

If the answer to any of the questions is "yes" for directors controlling at least half of the board-level voting power on the demand board, then demand is excused as futile for purposes of that claim.[75] For purposes of the Double-Futility Test, the analysis also proceeds board-by-board.

The claim-by-claim, director-by-director, and board-by-board analysis is not an analytical checklist. When claims are closely related, a court can evaluate them together. When directors are similarly situated, a court can evaluate them as a group. If other claims involve the same directors and arise out of the same nucleus of operative facts, then an analysis that results in demand being excused for one claim causes demand to be "excused for those other claims as well."[76] And under the Double-Futility Test, where the first-tier and second-tier boards have identical composition, the court need only conduct the analysis once.

Both the Plaintiff Feeder Fund and the Master Fund have the same Board. The singular question is therefore whether the Complaint alleges facts that provide reason to doubt that three of the five Directors could properly exercise their "independent and disinterested business judgment" in deciding whether to pursue

---

[75] *Id.* The more complex formulation reflects the fact that a certificate of incorporation can depart from the one-director-one-vote model. *See 8 Del. C.* § 141(d).

[76] *Fox Corp.*, 2024 WL 5233229, at *8; *see Walton,* 2023 WL 3093500, at *29 ("If another set of claims arises out of a different nucleus of operative facts or concerns a different transaction, then the court moves on to the next claim and repeats the process.").

the claims in the Complaint.[77] No one argues that Perkins could impartially consider a demand, but he is only one director. The demand futility inquiry turns on the four Outside Directors.

The Complaint does not allege that the Outside Directors are interested in the challenged decisions. The Complaint does allege that the Outside Directors have longstanding ties to Perkins because of their years of service on the Board. Three of the four Outside Directors have been with the Master Fund since its inception in 2003. Mann has been an Outside Director since March 2013. Combined, the four Outside Directors have served for eighty-eight years on the boards of nine different funds created and managed by Perkins and the Investment Manager. They also could expect to serve on new funds that Perkins and the Investment Manager formed.[78]

Standing alone, those lengthy years of joint service, receipt of past benefits, and inferable expectations about future benefits would be unlikely to compromise the

---

[77] *Rales*, 634 A.3d at 934; *accord Stone v. Ritter*, 911 A.2d 362, 367 (Del. 2006); *In re TrueCar, Inc. S'holder Deriv. Litig.*, 2020 WL 5816761, at *11 & n.129 (Del. Ch. Sept. 30, 2020) (cleaned up).

[78] *See Goldstein v. Denner*, 2022 WL 1671006, at *47–48 (Del. Ch. May 26, 2022) (discussing implications of expectations regarding future positions for independence); Jared A. Ellias et. al., *The Rise of Bankruptcy Directors*, 95 S. Cal. L. Rev. 1083, 1095–98, 1128–31, 1136 (2022) (same in bankruptcy context); Da Lin, *Beyond Beholden*, 44 J. Corp. L. 515, 525–26, 531–50 (2019) (same in startup context).

Outside Directors for purposes of demand futility.[79] But they remain part of the mix for the overarching reason-to-doubt test.

The real question is whether the Outside Directors face a substantial risk of liability. For purposes of that analysis, all four Directors are similarly situated.

When demand futility turns on whether a defendant faces a substantial risk of liability, "a court can simply analyze the claim."[80] The Delaware Supreme Court introduced the substantial-risk-of-liability test to ensure that a plaintiff could not disqualify a director from considering a demand simply by naming the director as a

---

[79] *Compare Beam*, 845 A.2d at 1051–52 ("Mere allegations that they move in the same business and social circles, *or* a characterization that they are close friends, is not enough to negate independence for demand excusal purposes.") *with In re BGC P'rs, Inc.*, 2019 WL 4745121, at *11–13 (Del. Ch. Sept. 30, 2019) (drawing pleading-stage inferences that directors were not independent based on lengthy joint board service, related remuneration, and personal ties), *In re Oracle Corp. Deriv. Litig.*, 2018 WL 1381331, at *19 (Del. Ch. Mar. 19, 2018) (same); *see generally In re Oracle Corp. Derivative Litig.*, 824 A.2d 917, 938 (Del. Ch. 2003) ("Delaware law should not be based on a reductionist view of human nature that simplifies human motivations on the lines of the least sophisticated notions of the law and economics movement.").

[80] *MacLaughlan v. Einheiber*, — A.3d —, —, 2026 WL 615751, at *9 (Del. Ch. Feb. 26, 2026); *see Hanna v. Paradise*, 2025 WL 1836642, at *8 (Del. Ch. July 3, 2025) ("Because showing that a defendant faces a substantial likelihood of liability from a claim requires that the claim be legally viable, the Rule 23.1 analysis as to Wakeford effectively folds into the Rule 12(b)(6) analysis of the *Brophy* claim against him.").

defendant.[81] The goal of the inquiry was to guard against strike suits.[82] To satisfy the test, a plaintiff need only "make a threshold showing" that its claims "have some merit."[83]

In the Rule 12(b)(6) Decision, this court held that the Outside Directors face non-exculpated claims for approving the Asset Sale, not pursuing the Dissolution Plan, and not renegotiating the annual fee. Those claims have merit. The YWCA has not brought a strike suit. The allegations are serious and confront the Outside Directors with a substantial risk of liability.

The strongest argument against relying on the Rule 12(b)(6) Decision points to the ostensibly different pleading standards under Rule 12(b)(6) and Rule 23.1. Many decisions identify a difference, but when applied to representative actions, the pleading standards have converged.

---

[81] *Aronson*, 473 A.2d at 814–15. By introducing this test, *Aronson* marked a sea change in Delaware law and departed from longstanding precedent, including *McKee v. Rogers*, 156 A. 191 (Del. Ch. 1931) (Wolcott, C.), *Miller v. Loft, Inc.*, 153 A. 861 (Del. Ch. 1931) (Wolcott, C.), and *Fleer v. Frank H. Fleer Corp.*, 125 A. 411 (Del. Ch. 1924) (Wolcott, C.). The historical context suggests that *Aronson* responded to a practitioner contretemps over *Zapata*, 430 A.2d 779. Many commentators had expressed fear that *Zapata* undermined the business judgment rule. *See EZCORP*, 2016 WL 301245, at *26 & n.18 (collecting authorities). The *Aronson* decision provided an opportunity to calm the waters by reinforcing Rule 23.1 as a pleading-stage bulwark against weak derivative claims.

[82] *See MacLaughlan*, 2026 WL 615751, at *9.

[83] *Rales*, 634 A.2d at 934.

Under the particularized pleading requirement of Rule 23.1, "conclusionary [sic] allegations of fact or law not supported by allegations of specific fact may not be taken as true."[84] But plaintiff "need only allege specific facts; he need not plead evidence."[85] And when evaluating the complaint, the court still "must accept as true all of the complaint's particularized and well-pleaded allegations, and must draw all reasonable inferences in the plaintiff's favor."[86] In other words, if the pleading supports competing inferences, both of which are reasonable, then the court must adopt the plaintiff-friendly inference. The court cannot draw a defense-friendly inference at the pleading stage, even if that inference seems relatively stronger than a competing (and reasonable) plaintiff-friendly inference.[87]

Compare the resulting pleading standard with how Delaware courts apply Rule 12(b)(6) in representative actions. There too, a plaintiff must plead "specific facts" and cannot rely on "conclusory allegations."[88] There too, "the trial court is not

---

[84] *Grobow*, 539 A.2d at 187.

[85] *Aronson*, 473 A.2d at 816; *see Brehm*, 746 A.2d at 254 ("Rule 23.1 is not satisfied by conclusory statements or mere notice pleading. On the other hand, the pleader is not required to plead evidence. What the pleader must set forth are particularized factual statements that are essential to the claim. Such facts are sometimes referred to as 'ultimate facts,' 'principal facts,' or 'elemental facts.'" (footnotes omitted)).

[86] *Zuckerberg II*, 262 A.3d at 1048.

[87] *Fox Corp.*, 2024 WL 5233229, at *7.

[88] *See Price v. E.I. DuPont de Nemours & Co.*, 26 A.3d 162, 166 (Del. 2011) ("We decline . . . to accept conclusory allegations unsupported by specific facts . . . ."); *Nemec*

required to accept every strained interpretation of the allegations proposed by the plaintiff," but only "reasonable inferences that logically flow from the face of the complaint."[89] To be sure, cases contrast the particularized pleading standard under Rule 23.1 with the notice pleading standard under Rules 8 and 12(b)(6),[90] and for allegations of director disinterestedness and independence, the distinction can be

---

*v. Shrader*, 991 A.2d 1120, 1125 (Del. 2010) ("We do not . . . blindly accept conclusory allegations unsupported by specific facts . . . ."); *Gantler v. Stephens*, 965 A.2d 695, 704 (Del. 2009) (same); *Feldman v. Cutaia*, 951 A.2d 727, 731 (Del. 2008) (stating that "conclusory allegations need not be treated as true"); *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006) ("A trial court is not . . . required to accept as true conclusory allegations without specific supporting factual allegations." (internal quotation marks omitted)); *Solomon v. Pathe Commc'ns Corp.*, 672 A.2d 35, 38 (Del. 1996) ("[C]onclusions . . . will not be accepted as true without specific allegations of fact to support them." (internal quotation marks omitted)). Some decisions even cite derivative action precedents when framing the Rule 12(b)(6) pleading standard. *E.g.*, *In re Nat'l Auto Credit, Inc. S'holders Litig.*, 2003 WL 139768, at *12 (Del. Ch. Jan. 10, 2003) (citing *Grobow*, 539 A.2d at 187–88 & n.6); *Cal. Pub. Emps.' Ret. Sys. v. Coulter*, 2002 WL 31888343, at *15 (Del. Ch. Dec. 18, 2002) (same).

[89] *Malpiede v. Townson*, 780 A.2d 1075, 1083 (Del. 2001); *accord Page v. Oath Inc.*, 270 A.3d 833, 842 (Del. 2022); *Caspian Alpha Long Credit Fund, L.P. v. GS Mezzanine P'rs 2006, L.P.*, 93 A.3d 1203, 1205 (Del. 2014); *Gen. Motors*, 897 A.2d at 168; *see Norton v. K-Sea Transp. P'rs L.P.*, 67 A.3d 354, 360 (Del. 2013) ("We do not, however, credit conclusory allegations that are not supported by specific facts, or draw unreasonable inferences in the plaintiff's favor.").

[90] *E.g.*, *Zuckerberg II*, 262 A.3d at 1048; *Brehm*, 746 A.2d at 254; *Malpiede*, 780 A.2d at 1082–83; *Solomon,* 672 A.2d at 39.

50

meaningful.[91] But for the factual allegations giving rise to a cognizable claim, the

standards functionally align.[92]

---

[91] *E.g.*, *In re The Student Loan Corp. Deriv. Litig.*, 2002 WL 75479, at *3 (Del. Ch. Jan. 8, 2002); *Akins v. Cobb,* 2001 WL 1360038, at *5 (Del. Ch. Nov. 1, 2001); *Gagliardi v. TriFoods Int'l, Inc.*, 683 A.2d 1049, 1054 (Del. Ch. 1996) (Allen, C.).

From a purely textual perspective, it is not clear that the particularity requirement applies to the merits allegations supporting a claim. During the development of demand futility law, Rule 23.1 stated: "The complaint [shall] . . . allege with particularity the efforts, if any, made by the plaintiff to obtain the action he desires from the directors or comparable authority and the reasons for his failure to obtain the action or for not making the effort." That language requires particularity about "efforts" and "reasons." It sought to require more than a bare allegation that "demand would be futile" or slightly more detailed allegations that demand would be futile because the defendants would have to sue themselves, suffer from structural bias, or participated in the challenged transaction. *See* Michael P. Dooley & E. Norman Veasey, *The Role of the Board in Derivative Litigation: Delaware Law and the Current ALI Proposals Compared*, 44 Bus. Law. 503, 506 (1989). To my mind, it requires an interpretive stretch to read that language to require particularity in the factual allegations about the underlying claim that gives rise to a reason for not making the effort—or at least greater factual specificity than Delaware law already requires for breach of fiduciary duty claims. Along similar lines, while serving on this court, Justice Jacobs justified Rule 23.1's heightened pleading requirement by noting that "a motion to dismiss under Rule 23.1 is not intended to test the legal sufficiency of the plaintiff's substantive claim." *Levine v. Smith*, 1989 WL 150784, at *5 (Del. Ch. Nov. 27, 1989), *aff'd*, 591 A.2d 194 (Del. 1991). In other words, the heightened pleading requirement addresses disinterestedness and independence. *Id.*

The Safe Harbor Amendments of 2025 furthered the convergence for purposes of director disinterestedness and independence. *See* 8 *Del. C.* § 144. Now, if a board of a public corporation has determined that a director is independent under applicable listing standards, then a "heightened" presumption of independence applies that "may only be rebutted by substantial and particularized facts that such director has a material interest in such act or transaction or has a material relationship with a person with a material interest in such act or transaction . . . ." *Id.* § 144(d)(2). The heightened presumption applies to all actions, not just derivative actions. In other words, to plead that a director is interested or not independent for

51

Count I asserts claims against the Directors. In the Rule 12(b)(6) Decision, the court applied the specific-facts test and held that Count I pleads non-exculpable claims against the Outside Directors. Those non-exculpable claims pose a substantial threat of liability for the Outside Directors. Demand is futile as to Count I.

Counts VI and VII implicate the Asset Sale and arise out of a common nucleus of operative fact with the claims in Count I involving the Asset Sale. If the Outside Directors had to confront a demand to assert Counts VI and VII, they would be forced to decide whether to authorize a suit that would generate discovery into and eventually factual findings about the same decision that gives rise to the substantial threat of liability against them. The inferably bad faith nature of the Outside Directors' decision to approve the Asset Sale—as described in the Rule 12(b)(6) Decision—makes that determination even more fraught. There is reason to doubt whether the Outside Directors could consider Counts VI and VII impartially. Demand is futile for those claims too.

Count II asserts a claim for breach of fiduciary duty against the Investment Manager based on the same events described in Count I. Count III reframes the theories in Count II as claims for breach of the Advisor Agreement. Count IV asserts

purposes of a claim for breach of fiduciary duty that can escape the safe harbors and support a remedy, a plaintiff must now plead particularized facts.

[92] *See L.A. City Emps.' Ret. Sys. v. Sanford*, — A.3.d —, —, 2026 WL 125986, at \*37–39 (Del. Ch. Jan. 16, 2026) (collecting authorities).

a claim for unjust enrichment against the Investment Manager based on excessive annual fees.

As with Counts VI and VII, if the Outside Directors confronted a demand to assert Counts II, II, and IV against the Investment Manager, they would be forced to decide whether to authorize a suit that would generate discovery into and eventually factual findings about the same decisions that give rise to the substantial threat of liability against them. Plus, they would be deciding whether to authorize a suit against Perkins' principal affiliate, and all of the Outside Directors have enjoyed a long and beneficial relationship with Perkins. And there is the issue of the potential bad faith nature of the Outside Directors' decisions. Those factors collectively create a reasonable doubt about whether the Outside Directors could make an impartial decision about whether to assert claims against the Investment Manager. Demand is futile for those counts as well.

Demand is therefore futile as to both the Board of the Plaintiff Feeder Fund and the Board of the Master Fund. The YWCA has pled its Entitlement Claim at both levels. It therefore has standing to assert the Master Fund's Merits Claims.

## III.   CONCLUSION

The Rule 23.1 motion is denied.